HELFENSTEIN v. MEDART *et al.*, *Appellants*.

In Banc, December 23, 1896.

1. **Master and Servant**: INJURY TO SERVANT: VIOLATION OF MASTER'S RULES. The fact that a servant, who was injured by the bursting of a grindstone while operating it, was at the time violating the rules of the master in changing his clothes before time for quitting work, will not prevent his recovery, it appearing that such conduct on his part in no wise contributed to the accident.

2. ———: ———: ASSUMPTION OF RISKS. A servant does not assume the risk of a grindstone bursting from its being run at an excessive rate of speed, he being ignorant of what constituted an unsafe rate of speed and having relied in reference thereto on the instruction of his foreman.

3. **Evidence**: EXPERT WITNESS. One may testify as an expert witness on a matter pertaining to his special calling or profession, although his knowledge of the matter is derived from study rather than from actual experience.

4. **Master and Servant**: NEGLIGENCE: EVIDENCE. In an action by a servant against his master for injuries received from the bursting of a grindstone while operating it, evidence as to the custom of other persons in using a similar appliance is inadmissible.

5. ———: ———: ———: HARMLESS ERROR. The admission, however, of such evidence will not constitute reversible error where it appears that it was harmless.

*Appeal from St. Louis County Circuit Court.*—HON. RUDOLPH HIRZEL, Judge.

AFFIRMED.

*Nathan Frank, C. W. Bates, Seymour D. Thompson, and C. P. & J. D. Johnson for appellants.*

(1) At the time deceased was injured he was not discharging to the defendants any duty he owed them under his employment. On the contrary, he was willfully neglecting such duty, and in doing so voluntarily placed himself in a perilous position, from which the injury resulted; consequently the defendants are not liable. The rule upon this point is that the master is not liable to his servant for injuries received by the latter in consequence of his having left his post of duty and voluntarily placed himself in a position of danger. *Schaub v. Railroad*, 106 Mo. 74; *Francis v. Railroad*, 110 Mo. 387, and cases cited. (2) Even if deceased did not leave his post of duty, still the bursting of the stone with the resulting injury to him was a risk or incident of the deceased's employment, which he voluntarily assumed, and defendants are not liable. *Schaub v. Railroad*, 106 Mo. 74; *Bohn v. Railroad*, 106 Mo. 429; *Alcorn v. Railroad*, 108 Mo. 81. (3) The deceased was guilty of negligence which directly contributed to his death. For this reason, also, defendants are not liable. *Smith v. Railroad*, 113 Mo. 76; *Alcorn v. Railroad*, 108 Mo. 81; *Ring v. Railroad*, 112

Mo. 220. (4) There was no evidence tending to show that the stone which burst and injured deceased was, at the time, being run at an unsafe speed. Without such evidence there was no proof that the stone burst by reason of the negligence of the defendants. In the absence of such proof defendants are not liable. (5) If it be held, however, that there was evidence tending to show that the stone was being run at a dangerous rate of speed, still defendants are not liable; for the deceased himself determined and fixed the rate of speed, and could, if he had seen fit, have changed to a slower and maybe a safer speed. So that if the stone exploded by reason of the speed at which it was being revolved, it was by reason of the act of the deceased and not of the defendants, and the latter are not liable. *Evans v. Railroad*, 62 Mo. 49; *Boettger v. Scherpe, etc., Co.*, 124 Mo. 87; *Nicholds v. Crystal Plate Glass Co.*, 27 S. W. Rep. 516; 28 S. W. Rep. 991. (6) The testimony of the witness Flad which was the only testimony on the point, did not amount to evidence of the fact that defendants ran the stone in question at a dangerous or negligent speed; because *first*, he was not an expert, consequently not competent to testify on the subject, and *second*, his statements were expressions of opinion and not evidence of the fact. *Turner v. Haar*, 114 Mo. 335. (7) Besides, the trial court erred in permitting the witness Flad to testify over defendants' objections and exceptions to what. in his opinion, was a safe and what was not a safe speed at which grindstones could be run; because, *first*, it appeared that the witness was not qualified as an expert to testify on the point, and, *second*, the opinions he gave were merely efforts to supply a proof of facts, not otherwise proven, by use of opinion evidence. · *Turner v. Haar*, 114 Mo. 335; *Boettger v. Scherpe, etc., Co.*, 124 Mo. 87; *Eubanks v. City*, 88 Mo. 650; *Koons v. Railroad*, 65 Mo.

592; *Riley v. Sparks*, 52 Mo. App. 572; *Gates v. Railroad*, 44 Mo. App. 488; Rogers on Exp. Test., pp. 2, 6, and 34; Lawson on Exp. and Op. Ev., p. 130. Plaintiff's instructions based on that testimony were improperly given. *Harding v. Wright*, 119 Mo. 1–9.

*J. Hugo Grimm* and *Rassieur & Schnurmacher* for respondent.

(1) The questions of defendants' negligence and deceased's contributory negligence were properly left to the jury. There was abundant evidence of negligence on the part of defendants in operating the stones at an unsafe rate of speed. (2) Deceased was not violating any rule made for his protection and if he did violate a rule in removing his overalls before the whistle blew, that would not prevent a recovery unless by violating the rule he contributed to the injury. But this question was submitted to the jury. Again, there was no evidence that he had any notice of such a rule as it is now claimed he violated. *Francis v. Railroad*, 110 Mo. 387. (3) Deceased did not assume the risk of injury resulting from the negligence of the defendants; this is especially true as he knew nothing of their negligence or of the danger resulting therefrom. *Porter v. Railroad*, 71 Mo. 72; *Waldhier v. Railroad*, 87 Mo. 46. (4) The instructions given in behalf of plaintiff were all proper declarations of law, were based upon the evidence, and were in such form as has been approved by this court. *Gibson v. Railroad*, 46 Mo. 167; *Porter v. Railroad*, 71 Mo. 72; *O'Mellia v. Railroad*, 115 Mo. 211; *Waldhier v. Railroad*, 87 Mo. 46; *Hamilton v. Railroad*, 108 Mo. 201; *Swadley v. Railroad*, 118 Mo. 268; *Settle v. Railroad*, 127 Mo. 341; *McGowan v. Railroad*, 61 Mo. 528; *Keighan v. Kavanaugh*, 62 Mo. 231; *Malone v. Morton*, 84 Mo. 439; *Stephens v. Railroad*, 86 Mo. 229.

(5) Mr. Flad, a graduate of the scientific department of Washington University, a mechanical engineer by profession, who had investigated and studied the question of speed at which stones can be run, testified as to the maximum safe speed. The objection that he was not competent to testify as an expert is without merit. Rogers on Exp. Test., pp. 45–47; Lawson on Ev., p. 10, rule 6a.

### DIVISION TWO.

BURGESS, J.—The widow of William Helfenstein brought this suit in the circuit court of the city of St. Louis to recover damages for the death of her husband. The venue was subsequently changed to the circuit court of the county of St. Louis, where a trial was had to a jury, resulting in a verdict and judgment in favor of plaintiff in the sum of $4,500. Defendants bring the case to this court by appeal for review.

At the time of the accident and for eight months prior thereto deceased was in the employ of defendants as a grinder in their factory in the city of St. Louis, and as such it was his duty to polish iron or steel castings by holding them in contact with a grinding-stone revolved by means of a pulley and belting operated by steam power.

The petition contains the following averments:

"But plaintiff states that defendants wholly neglecting and disregarding their duty in that behalf furnished said Helfenstein with a grinding-stone on said eighth day of February, 1893, of an unusually large circumference and connected the same by belting with a pulley of large circumference which had theretofore been used in connection with a considerably smaller grinding stone; that by connecting this larger stone with said large pulley the stone was revolved at a very high and dangerous rate of speed, and that defendants

knew, or by the exercise of ordinary care might have known, that by connecting said grinding-stone with said pulley as aforesaid and causing said stone to revolve at the high rate of speed aforesaid, the said stone would fly to pieces and injure any person who happened to be near it.

"And plaintiff states that on February 8, 1893, while said Helfenstein was in the employ of defendants as aforesaid, and was standing in front of the grinding-stone, at which he had been working until a short time before, said grinding-stone suddenly flew to pieces, on account of the high speed at which it was revolving, and the parts thereof, and also an iron splasher which was fastened in front of it were violently hurled against said William Helfenstein, striking him in the right hip and wounding and injuring him."

The answer, after denying all allegations of negligence contained in the petition, alleged that the bursting of the stone was one of the dangers assumed by deceased in his employment; that at the time it burst, deceased, knowing the dangers incident to his action, had voluntarily placed himself in front of the stone, while not in the discharge of his duty, and was by reason thereof guilty of contributory negligence.

Plaintiff replied to the answer and denied all new matter contained therein.

At the time of the accident defendants conducted a large factory in said city for the manufacture of all sizes of iron pulleys. The pulleys manufactured by them consist of a cast iron hub with radiating spokes, with a flat circular rim of wrought iron or steel attached to the ends of the spokes. A part of the process of manufacture was to grind down the edges and faces of the rims of the pulleys by means of grindstones, mounted in machines constructed for that especial purpose. There were six or seven of said machines

in use in defendants' factory, in the grinding depart-
ment, which department was under the supervision
of a foreman, and it and other departments were under
the supervision of a superintendent.

At the time of the injury deceased was about
twenty-six years of age, and up to the time he entered
the service of defendants he had been a whitewasher.
For about a month after he began work he was called
a "handy" man, and was then put to work grinding
stones. No instructions were given him, but the man
working nearest to him in the same business gave him
advice and assistance. He was still working on small
pulleys at which new hands were put to grinding. He
did not know the speed of the grindstone, nor did the
foreman know the limit of speed at which they might
be safely run.

Each grinding machine consisted of a heavy
wooden square frame about —— feet long, seven feet
wide and three and one half feet high. At the left and
rear corner of these machines the grindstone used for
grinding the pulleys was mounted on a shaft or axle,
the latter being at right angle with the frame, and the
face or outer edge of the stone being toward him. An
iron shaft was set in the frame running from right to
left in a way to admit of a mandrel being keyed to it
so that one end projected beyond the frame in front of
the grindstone. To the end of the mandrel the pulley
to be ground was attached temporarily, and the shaft
and mandrel were geared in the frame in such a way
that a grinder operating the machine could, while
standing at a corner of the frame diagonally across
from the stone, place any part of the pulley to be
ground in contact with the stone, by means of a lever
with a circular handhold fixed to the machine at that
corner. The position of the grinder, and plan of con-
struction of the machine will appear from the following
map:

EXHIBIT. A

"A" is the grindstone, "C" the pulley being ground, "G" the mandrel, and "E" the position at which the operator stands. The pulley being ground could not be placed in contact with the stone or the grinding itself done, unless the operator stood at that point and manipulated the lever mentioned; although it was necessary for the grinder, in the discharge of his duties, at times while a stone was revolving, to leave his position and pass in front of the stone.

There was at or near E, a brake, so that when the operator got the pulley in proper contact with the stone, he could, by applying the brake, keep it there.

It was sometimes necessary for operators of the machines to get in front of the stone, when the edge of the pulley was being ground, to see if it was grinding true, and when oiling, cleaning the machine, or hammering the pulleys. When hammering the pulley the operator would sometimes be in front of the stone as long as two hours at a time, during which time the pulley was stopped. There was a splasher in front of the stone to prevent the operator being splashed with water while working in front of the stone. When the grinder was standing at the lever he was about seven feet out of the line of the centrifugal motion or force of the revolving stone, and out of the way of flying fragments from the stone in case of its flying to pieces.

The stones used in the machines when first placed in them, varied in size from forty-eight to seventy-two inches in diameter. The engine and shafting used in the factory were geared so as to cause the stones to revolve, when the machine was in operation, at two different rates of speed, according to the size of the stone used therein, designated by the grinders "fast speed" and "slow speed." The fast speed was obtained by means of a belt and pulley on the main or driving shaft thirty-six inches in diameter and another

on the stone shaft or axle eighteen inches in diameter, and the slow speed by means of a thirty inch pulley on the main shaft and a twenty-four inch one on the stone shaft and a change of the speed was effected by transferring the belt from one set of pulleys to the other. It does not appear that either the grinders or the defendants knew the number of revolutions the stones made at either rate of speed; but it does appear that the stones had been run in the factory for many years prior to the accident to deceased at the speeds mentioned and that that speed was maintained because it was the rate at which the grinding of the pulleys could be done to the best advantage.

The stones generally wore out in the machines, or were ground down to a size at which they were discarded, in from two to five weeks, according to their size and texture. When a fresh stone was required by a grinder for the machine he was operating it was his duty to select one for himself, suited to his purpose, from the stock on hand, and to call on the foreman of the department to detail other hands to assist him in mounting the stone in the machine.

The cylinder of the engine made one hundred and two revolutions in a minute and the main shaft about one hundred and sixty-three revolutions per minute. No change of speed could be made while the machinery was in motion, and was generally made during the noon hour or after working hours. Usually the grinder determined for himself when he would change the speed, but in this instance when deceased put in the new stone, which was about fifty-one inches in diameter he called on the foreman and asked him whether he should change the pulleys and put on the slow speed, and the foreman told him that he didn't think it was necessary, and the change was not made.

The same afternoon of the day in which the stone

was adjusted, and a few minutes before quitting time, when deceased was standing at a point marked X on the plat, and about two feet out of the line of the stone, removing his overalls, the stone flew to pieces and he was struck by pieces of the stone or by the splasher and received injuries from which within two days thereafter he died. The deceased had not quit work at the time of the accident. The stone was then grinding the edge of a pulley, and when it burst broke out some of the spokes of the pulley.

There was an unwritten rule of defendants, which deceased knew, forbidding the employees from changing their clothing before the whistle signal for them to quit was blown, though this was often done without the knowledge of the foreman and while the machinery was in operation.

The stone that burst was not exceeding fifty-one inches in diameter, and the evidence showed that its periphery speed with the engine running one hundred and two and the gearing shown to have been in use at that time, was four thousand three hundred and fifty-five feet per minute, while the maximum rate of safe speed at which such a stone could be run was three thousand, four hundred feet periphery measure per minute.

Ten or twelve different stones had burst in the factory in the thirteen years preceding the accident, about one half of which showed no defects, or cause for their bursting, running at fast speed, and the other half at slow speed. Of one or two of these, deceased had knowledge at the time of his injury.

At the close of plaintiff's evidence, defendants prayed the court to instruct the jury: "That under the pleadings and evidence, plaintiff is not entitled to recover."

The court refused to give the instruction, and de-

fendants duly excepted. The same instruction was offered by defendants at the close of all the evidence. The court refused to give it, and defendants again excepted.

The following instructions were given on behalf of plaintiff, to the giving of which defendants duly saved their exceptions:

"1. The court instructs the jury that if they believe from the evidence that on February 8, 1893, the plaintiff was the lawful wife of William Helfenstein; that prior to and on said day the said William Helfenstein was in the employ of defendants as a grinder; that on said day, whilst in the discharge of his duties as such grinder, he was, without negligence on his part directly contributing thereto, injured by the bursting of the grinding-stone at which he was at work and subsequently died from said injury; that said grinding-stone burst because it was revolving at too high a speed; and that defendant knew, or by the exercise of ordinary care might have known, that said stone was revolved at said high speed and as a result was likely to burst, then your verdict must be for the plaintiff.

"2. The court instructs the jury that it was the duty of defendants in operating its machinery to use and exercise care, skill, and caution, to protect the lives and persons of its employees, and not to expose them to unusual danger from the operation of said machinery; and the degree of care must be proportionate to the dangerous nature of the means, instruments, and machinery used.

"3. The jury are instructed that if they believe from the evidence that the agent of defendants, whose duty it was to superintend the work of the department in which Helfenstein was working knew, or by the exercise of ordinary care and prudence might have known, that said grinding-stone was being revolved at a

high rate of speed and likely to burst as a result thereof, then such knowledge of said agent would be the knowledge of defendant, and the failure to know that said stone was so revolving and was likely to burst, was the neglect of the defendants.

"4.  In determining whether plaintiff's husband, William Helfenstein, exercised reasonable care in working at the stone in question, you are instructed that he was required to exercise such care as a careful and prudent grinder would have exercised under like circumstances.

"5.  Although you may believe from the evidence that the deceased, William Helfenstein, knew, or by the exercise of ordinary care might have known, that the stone in question, besides running at a high speed was likely to burst as a result thereof, and continued to work at the same, yet, if the danger was not imminent and obvious, and not such as to threaten immediate injury to him from the use of said stone at the time, and under the circumstances of the injury; or if he might have reasonably supposed that he could safely work about it by the use of care and caution, he can not be said to have been guilty of such contributory negligence as to defeat a recovery by plaintiff, provided that while working at said stone he exercised such care as a careful and prudent man of his calling would exercise under like circumstances.

"6.  The court instructs the jury that if they find from the evidence that the stone was being revolved at too high a speed, and that it was likely to burst in consequence thereof, yet if you find that whilst the situation was sufficiently serious to arouse in plaintiff's husband a suspicion or fear of danger, and that under the circumstances Helfenstein submitted to defendant's foreman the question whether or not the pulleys should be changed so as to reduce the speed, and was informed

by him that there was no necessity to change the pulleys, and that plaintiff's husband relied upon what the foreman said and upon that reliance used the machine at the speed in question, then the mere fact of Helfenstein's undertaking to work at the stone under those circumstances would not make him guilty of contributory negligence so as to prevent a recovery in this action by the plaintiff, provided, you further find and believe from the evidence that the foreman aforementioned had authority to regulate and advise what pulleys the grinders should use and what speed should be applied for the running of said grindstones.

"7. The court instructs the jury, that if they find from the evidence that the injury to and death of plaintiff's husband, directly resulted from negligence or carelessness of defendants in operating their machinery at the time of the accident (as defined in these instructions), then such injury received was not the result of the ordinary risk and danger assumed by plaintiff's husband when he entered into defendants' service, nor naturally incident thereto.

"8. By the term 'negligence' as used in these instructions, is meant the failure to exercise the care usually exercised by persons of ordinary caution and prudence under like circumstances; and 'by the term 'reasonable care,' or 'ordinary care,' is meant such care as is usually exercised by persons of ordinary prudence under similar circumstances.

"9. The court instructs the jury that the fact that William Helfenstein at the time of the injury to him was taking off his overalls and that it was against defendants' rules so to do, will not itself prevent a recovery by plaintiff, unless in so removing his overalls and standing at the place where he was hurt he was guilty of an act of negligence directly contributing to his injury; that is to say, unless you find that but for the fact

of his removing his overalls, and standing at said place, he would not have been injured, he can not be found guilty of contributory negligence on that account.

"10.　The court instructs the jury that if they find for the plaintiff they may award her such sum in their verdict, not exceeding five thousand dollars, as they may deem fair and just under the evidence in this case, with reference to the necessary injury resulting to her from the death of her husband."

The court slightly altered and gave the following instruction number 2, offered on behalf of the defendants, and also gave the following instructions, numbers 1 to 5, inclusive, offered on behalf of the defendants:

"2.　And the jurors are also instructed that if they believe from the evidence that the statement by the defendants' foreman to deceased, to the effect that he did not think it was necessary to change the pulleys on the shafting which propelled the stone in question from a fast to a slow speed, was not in the nature of a command or direction by the said foreman as such to the deceased as an employee, but was a mere expression of opinion upon the part of the foreman relative to the matter, and that the deceased under his employment was empowered to change or to have the said pulley changed from a fast to a slow speed as in his judgment was necessary, that then the defendants are not liable in this action, because of the said advice of, or opinion expressed by, said foreman."

"1.　The jurors are instructed, that if they believe and find from the evidence that the deceased knew that there was danger of the stone in question bursting while the same was revolving, and that so knowing he stood in front of said stone, in a position where he was liable to be struck with pieces of the same, in the event it flew to pieces, that it was not necessary in the discharge of the duties of his employment to so stand in

front of said stone, and thus while in front of it, the same flew to pieces, and a piece thereof, or the iron splasher struck him, inflicting the injuries from which he died, and that he was so injured by reason thereof, that then the deceased was guilty of contributory negligence, and plaintiff is not entitled to recover, even though the jurors may also believe and find that the defendants were guilty of negligence in running said stone at an unsafe speed.

"2. The jurors are also instructed that if they believe from the evidence that the speed at which the stone in question was revolving at the time it broke into pieces was such speed as persons of ordinary prudence would have adopted in running stones of similar dimensions, in similar machines, under similar circumstances, that then they should find a verdict in favor of defendants.

"3. And if the jurors believe that the said stone was being run at a reasonably safe speed at the time, and that it broke in pieces from some unknown cause, or some cause that the defendants by the exercise of reasonable care could not anticipate or foresee, that then they are not liable in this action.

"4. The jurors are also instructed that if they believe from the evidence that the stone in question at the time it broke in pieces was being revolved or run at a rate of speed at which stones of similar kinds and dimensions are customarily run without breaking in pieces, and that the defendants had no reason to apprehend that the stone would burst in pieces, that then they were not guilty of negligence in the premises, and the verdict should be in their favor.

"5. And if the jurors believe that the deceased knew that stones of the kind in question were generally used at the speed testified to, and while being used in the manner testified to were liable to fly in pieces

and injure persons working about the same, and there-
after continued in his said employment, and working
around said stone, that then such danger was one of
the risks incident to his employment which he thereby
assumed, and plaintiff is not entitled to recover.''

1.  The first point insisted upon by defendants is
that at the time deceased received the injury from the
effects of which he died, he was not in the discharge of
his duty toward defendants, but was in a place of dan-
ger not in the line of his duty, which he voluntarily
assumed, and for which they are not liable.  It is not
claimed that deceased was at the time of his injury
violating any rule of the company, made by it for the
protection of those in its service, but that he was vio-
lating a rule forbidding its employees from changing
their clothing before quitting time, and in order that
he might do so, without being observed by the fore-
man, he voluntarily placed himself in a place of dan-
ger.

While the injury was on the right side of the back
near the lower end of the spine extending to the right
buttock, which would seem to indicate that he had his
back turned toward the stone at the time of its bursting,
it does not appear that he was necessarily neglecting his
duty at the time.  The stone was still grinding on the
pulley.  The evidence did not show that the violation
of the rule by deceased had anything whatever to do
with the flying to pieces of the stone; on the contrary
it tended to show that its rapid periphery speed did
cause it.

In Beach on Contributory Negligence [2 Ed.],
sec. 45, it is said: ''Some mere collateral wrong-doing
by the plaintiff, that has no tendency to occasion the
injury, can not, of course, avail the defendant through
whose negligence the injury has been suffered.''

So in *Baker v. Portland,* 58 Me. 199, it is said: "The fact that * * * he [the plaintiff] was smoking a cigar in the streets, in violation of a municipal ordinance, while it might subject the offender to a penalty, will not excuse the town for a neglect to make its ways safe and convenient for travelers, if the commission of the plaintiff's offense did not in any degree contribute to produce the injury of which he complains." Beach on Contributory Negligence, sec. 45, *supra.*

The violation of the rule by deceased in changing his clothes before quitting time was merely collateral to the accident, and had no more to do with producing the injury, than the smoking of the cigar by the plaintiff had in the *Baker* case.

There was no rule prohibiting operatives from going in line with the stone while it was running, on the contrary their duties frequently required them to do so, and when hammering on the pulley to remain in line with the stone for as long as two hours at a time. Moreover, it appeared that deceased was not standing on a line with the stone, but that he was at least two feet to one side of a direct line from it, in the direction in which he was standing.

The case of *Schaub v. Railroad,* 106 Mo. 74, is not, we think, in point. In that case deceased left his post of duty on top of a moving car, swung himself off on one side and collided with another car standing on a side track, which caused his death, and it was held that the railroad company was not liable. Now in the case at bar if deceased, while changing his clothing, had by his own volition come in contact with some part of the machinery, or its appliances about which he was engaged at work, it may be conceded that defendant would not be liable; but that is not this case.

In the case of *Francis v. Railroad*, 110 Mo. 387, Francis, an employee of defendant, was killed while violating one of its rules, made for the protection of its employees, forbidding them from getting on switch engines while in motion and it was held that the company was not liable. In the case in hand, deceased did not by reason of the violation of any rule of the company, cause the stone to burst, or by any act of his own come in contact with it, and does not come within the rule announced in either of those cases.

Whether or not deceased was, under the evidence, guilty of negligence which contributed to his injury, was, we think, for the consideration of the jury.

It is next contended that, even if deceased did not leave his post of duty, still the bursting of the stone with the resulting injury to him was a risk or incident of his employment, which he voluntarily assumed.

While it may be conceded that a "servant assumes the risk, more or less hazardous, of the service in which he engages, he has a right to assume that all reasonable attention will be given by his employer to his safety, and that he shall not be carelessly and needlessly exposed to risks, which might be avoided by ordinary care and precaution on the part of his employer." *Boyce v. Fitzpatrick*, 80 Ind. 526. The evidence in this case, however, tends to show that deceased did not assume the hazard, if any, occasioned by the running of the stone at an excessive and dangerous rate of speed.

Defendant's foreman in the grinding room, Daniel H. Markham, testified that when deceased went to go to work on the stone he asked him whether he should change the pulleys or not, and he told him that it was not necessary. To change the pulleys, was to change the speed of the stone. While deceased may have been familiar with the operation of the machinery, he did

not know what was an unsafe rate of speed for the revolution of the stone, and had the right to rely upon the superior, or supposed superior, knowledge and judgment of his foreman with respect thereto, and to act in accordance therewith, and in so doing did not assume the danger attending the running of the stone at an excessive and dangerous rate of speed.

It is true that he assumed all risks that were reasonably incidental to the character of his work, but he did not assume risks which might occur by reason of the negligence of his employer, and which he could not have been expected to anticipate. Plaintiff's ninth instruction given upon this theory of the case was in accord with what has been said and when considered in the light of the evidence we think free from objection.

But it is argued that this instruction is in conflict with the first instruction given on the part of defendant. A careful reading of the instructions has satisfied us that they are not subject to this objection. They were simply based upon adverse theories of the questions presented by them as disclosed by the evidence, and not upon the same state of facts. The evidence was sufficient to justify the instruction upon either theory. It was the evidence that was conflicting with respect of the facts covered by these instructions, and not the instructions themselves.

A further contention is that there was no evidence tending to show that the stone was, at the time of the accident, being run at an unsafe rate of speed. This contention is predicated upon the assumption that the witness Flad, who testified as an expert in behalf of plaintiff to the effect that the periphery rate of speed at which the stone was running at that time was not safe, was not qualified to testify as an expert with respect to such matters, and that there was no evidence

aside from his statements which tended to show the rate of speed to be unsafe.

The witness testified that he was a mechanical engineer. That he was graduated at the Washington University in 1881, and since then had been engaged in both civil and mechanical engineering; that he had given some study to the investigation of the strength of grindstones, and the safe rate of speed at which such stones, differing in diameter from forty to seventy-two inches, might be run and were run in similar establishments to that of defendants in the city of St. Louis; thought that he could state what was a safe rate of speed, and that for a stone fifty-one inches in diameter, the periphery or surface speed should not exceed three thousand, four hundred feet per minute.

It has been said that, "a witness, otherwise qualified, may express an opinion on a matter pertaining to his special calling or profession, although his knowledge of that particular matter has been derived from study rather than from actual experience. It is the doctrine of the courts that study of a matter without practical experience in regard to it may qualify a witness as an expert." Rogers on Expert Testimony [2 Ed.], sec. 19, p. 45. See *Fort Wayne v. Coombs*, 107 Ind. 75; Lawson on Expert and Opinion Evidence, p. 10, rule 6.

Under the rule thus stated, the witness was, we think, qualified to testify as an expert. Moreover it was for the court to determine whether or not the witness was qualified to testify as an expert, and as his competency to testify as such was a matter resting largely in the discretion of the court, and as it does not appear that such discretion was abused, the judgment should not, in any event, be reversed upon that ground.

There was other evidence tending to show that the

surface rate of speed of the stone at the time approximated four thousand three hundred and fifty-five feet per minute.

During the examination of the witness last named by counsel for plaintiff there occurred the following:

"*Q.* You have heard the testimony given during part of this day, have you not? *A.* Yes, sir.

"*Q.* With that testimony in mind are you in a position to say to the jury what the customary speed of the grinding-stones, as used by the Medart Patent Pulley Company, is and whether they. are used for a similar purpose? *A.* If you ask me whether they were similar, I would say yes.

"*Q.* Are you able to say from your experience what the customary speed is at which stones may be run when grinding, and what is a safe rate of speed? *A.* I can say what it is in my opinion.

"*Q.* What would, in your opinion, be the customary highest rate of speed a grinding-stone of fifty-one inches in diameter, and six or seven inches in width might be run in polishing a pulley?

"*By Defendant:* We object to that because that is a matter for the jury to decide, and besides it is immaterial, irrelevant, and has no bearing on the issues of the case."

This objection was overruled, and defendants excepted. It is now insisted that the witness was allowed to state a conclusion to the jury based upon the hearing *of a part of* the other testimony in the case.

It is well settled that an expert witness should not be allowed to give his opinion as such upon a *part* of the facts in the case; but it will be observed that the objection in this instance did not go to that question, and only went .to the last question, hence the rule invoked by counsel for defendant is not applicable to it.

A still further objection is urged against the testimony of this witness, in .that he was permitted to testify, over the objections of defendants, to the rate of speed of similar grindstones, in other factories engaged in a similar business to that of defendants.

It has been repeatedly held in actions for damages on the ground of negligence, that evidence when offered on the part of defendant as to the custom of other persons or corporations in the use of the same kind of instrumentalities or appliances to that alleged to have caused the injury in question, or their manner of use, was immaterial and furnished no defense to the action. *Koons v. Railroad*, 65 Mo. 592; *Hosic v. Railroad*, 75 Iowa, 683; *Hamilton v. Railroad*, 36 Iowa, 31; *Earl v. Crouch*, 16 N. Y. Supp. 770; *Wright v. Boller*, 42 Hun, 77; *Louisville, etc., Railway Co. v. Wright*, 115 Ind. 378; *Metzgar v. Railroad*, 76 Iowa, 387; *Lake Erie, etc., Railroad Co. v. Mugg*, 132 Ind. 168.

The defendants could not in any way be held responsible for the negligence of others, and this evidence was, therefore, immaterial and should have been excluded. But as it did not show that any person had been injured by the bursting of grindstones in other factories, we do not think the judgment should be reversed upon that ground alone. And especially do we think this should not be done when the evidence is considered in connection with that of defendants' witness, Deslinger, superintendent of the Globe File Company, which showed that stones in that company, similar to the stone which flew to pieces, and caused the injury to deceased, had been run up to a speed as high as four thousand, two hundred feet per minute, and that not one stone had broken in that establishment for ten years. When the evidence in regard to the matter now under consideration is considered all

together it seems to us to be more in favor of defendants than against them.

It is also insisted that there was a fatal variance between the allegations of the petition and the proofs, or rather a failure of proof.

It is quite clear to us that there was not a failure of proof, that the petition when considered as a whole stated a good cause of action. At most there was but a variance between the allegations and the proof, and that question can not be raised for the first time in this court. While the petition alleged that it was the duty of the defendants to furnish deceased with good and reasonably safe and sufficient machinery with which to perform his work, and to see that the machinery at or near which he was set to work was in a reasonably safe condition, it also alleged that defendants, disregarding their duty, furnished deceased with a grinding-stone of unusually large size, and by carelessly and negligently adjusting it caused it to revolve at an excessive rate of speed, in consequence of which it flew into fragments and caused the injury from which he died. The averments were not alone that the grindstone was unsafe, but that the rate of speed at which it was revolved was unsafe, and the evidence tended to sustain that theory of the case. Clearly there was not a failure of proof.

Plaintiff's instructions are also criticised, and numerous objections urged against them, but, after a careful reading and comparison of them with those given in behalf of defendants, we are unable to see the force of the criticisms, and think them unwarranted. When taken altogether the instructions presented the case very fairly to the jury.

Finding no reversible error in the record, the judgment is affirmed. GANTT, P. J., concurs; SHERWOOD, J., dissents.

#### IN BANC.

PER CURIAM.—The foregoing opinion of BURGESS, J., handed down in division number two is adopted as the opinion of the court *in banc*, and the judgment of the circuit court is accordingly affirmed.   BRACE, C. J., BARCLAY and GANTT, JJ., concurring with BURGESS, J., therein; SHERWOOD, ROBINSON, and MACFARLANE, JJ., dissenting.

#### ON MOTION FOR REHEARING.

BURGESS, J.—Council for defendant in their motion for a rehearing filed in this case insist that the opinion is in conflict with *Fugler v. Bothe*, 117 Mo. 475, and *Lucey v. Hannibal Oil Co.*, 129 Mo. 32, but there is a very material difference in the facts as they appear from the decisions in those cases and the facts disclosed by the record in the case in hand.   In each of those cases the danger was obvious.

In the *Fugler* case the deceased, an experienced carpenter of mature age, was engaged in boarding up the sides of an air shaft.   He had worked on this work about four weeks.   While nailing on the boards he and another carpenter engaged in the same work with him stood on a plank from fifteen to seventeen inches wide which was securely fastened over a gutter, when deceased lost his balance, fell down into the shaft, and received injuries resulting in his death.   There was no pretense, says the court (at p. 494), "that his employer had any knowledge touching the danger of the place superior to that which he had; nor that the danger, whatever its character, was not perfectly obvious to a man of the most ordinary understanding; nor that it was not glaring, immediate, continuous, and the same all the time."

In the *Lucey* case the plaintiff knew all about the dangerous condition of the crossbeam which fell upon him and caused his injury, having theretofore assisted in placing and adjusting the props under it. It was not a latent defect of which he had no knowledge, and of which his employer knew, or might have known by the exercise of that degree of care and diligence that is required of the master in furnishing a safe place for his servant to work. They both knew its condition. The danger was not only obvious, but the plaintiff assisted in making it dangerous and thereafter continued to remain in the same service, in the face of danger which he knew to exist.

In the case at bar the danger was not obvious. There was nothing apparent from the grindstone itself or in the manner of its adjustment which indicated that it was dangerous to stand near it or in front of it, and it only became dangerous when running at an improper and excessive rate of speed. What was a safe rate of speed deceased did not know, but was in effect told by defendants' superintendent, that the speed at which the stone was revolving at the time of the accident was a safe rate of speed, and, being so informed, he had the right to rely upon the superior knowledge or supposed superior knowledge of the superintendent.

With respect to the knowledge of deceased of the danger attending the rate of speed at which the stone was being revolved at the time of the accident, the court at the instance of defendants instructed the jury as follows:

"And if the jurors believe that the deceased knew that stones of the kind in question were generally used at the speed testified to, and while being used in the manner testified to were liable to fly in pieces and injure persons working about the same, and thereafter continued in his said employment, and working around

said stone, that then.such danger was one of the risks incident to his employment which he thereby assumed, and plaintiff is not entitled to recover."

The assumption of risks by an employee is based upon his knowledge, or means of knowing, of the danger to which he is exposed in and about his employment and his continuation in the same employment thereafter, and the jury found in this case, under this instruction, that deceased did not know that the stone was being operated at a dangerous rate of speed at the time of the accident.   It follows that there was no assumption of risks on the part of deceased, because of the want of knowledge of the danger, attending the operation of the stone.   We adhere to the opinion and overrule the motion.   BRACE, C. J., BARCLAY and GANTT, JJ., concur; MACFARLANE, SHERWOOD, and ROBINSON, JJ., dissent.