ROSE POHLMAN AMBRUSTER v. LEVITT REALTY & INVESTMENT COMPANY, a Corporation, Appellant.—107 S. W. (2d) 74.

Division One, June 30, 1937.*

*NOTE: Opinion filed at September Term, 1936, April 21, 1937; motion for rehearing filed; motion overruled at May Term, 1937, June 30, 1937.

*William R. Schneider* for appellant.

*Max Sigoloff* for respondent.

BRADLEY, C.—Action for injuries alleged to have resulted from carbon monoxide gas escaping from a gas-operated refrigerator. Verdict for $8,000 went for plaintiff and defendant appealed from the judgment entered.

Plaintiff alleged that she and another young woman occupied furnished apartment 304 in defendant's apartment building at 3705 Washington Avenue, St. Louis; that the refrigerator furnished was an Electrolux, "operated by the ignition of a constantly flowing stream of illuminating gas;" that the refrigerator burner and other attachments thereto were defective, which defects caused to be "created and released, dangerous, poisonous and noxious gases;" that on March 17, 1932, she was overcome by such gases escaping from the refrigerator. Then follow eight separate specifications of negligence, but plaintiff went to the jury on negligent repair of the refrigerator.

The answer was a general denial and a plea of contributory negligence. The reply, we infer, was a general denial of new matter.

Defendant assigns error (1) on refusal of its demurrer to the evidence; (2) on plaintiff's Instruction No. 1; (3) admission of alleged incompetent evidence; and (4) on an alleged excessive verdict.

■ We might say here that plaintiff contends that after defendant's demurrer to the evidence was refused, it went to the jury on instructions hypothesizing facts and directing a verdict for defendant, if such facts were found, and is, therefore, in no position to challenge the sufficiency of the evidence. Such is no longer the rule. [Elkin v. St. Louis Public Service Co., 335 Mo. 951, 74 S. W. (2d) 600.]

At the time of plaintiff's alleged injury she was employed as a bookkeeper by a furniture company. Plaintiff and Miss Lorelle Lamb occupied the apartment. Measured by the demurrer, the following facts appear: Defendant "was to take care of everything" in the apartment, in short, keep the apartment furnishings in reasonably good order. According to plaintiff, about three days prior to March 17th, she and Miss Lamb "spoke to Mr. Levitt (department manager) about the refrigerator not operating, and at that time he sent a colored man upstairs to take care of it for us; I looked at it the evening that we came home that the man had fixed the refrigerator, and found that the flame was burning. It was a yellow flame. That was three days before March 17th. I reported that the following morning to Mr. Levitt." And prior to that time they had some trouble with the refrigerator and Levitt told them to watch the flame underneath the refrigerator and if that went out to notify him at once, and according to plaintiff, the flame went out, and Levitt was notified. (It is not claimed, however, that the going out of the flame in any manner caused gas to escape. On the contrary, it appears that, when such occurred, the gas was automatically cut off.)

Plaintiff further testified that she and Miss Lamb worked at the same place; that on March 17th they arrived home about six P. M.; that "it was very cold;" that she and Miss Lamb planned to take dinner that evening at the home of plaintiff's mother; that she, plaintiff, took a bath and partly dressed, but "thought I would wait until Miss Lamb was ready before I slipped my dress on;" that when Miss Lamb went into the bathroom, she, plaintiff, "picked up a book and started to read" and fell asleep. When she awoke she had "a dreadful headache" and it was too late to go to the mother's for the dinner engagement. "We tried to pull this in-a-door bed down and that is when we noticed the great loss of strength. We had difficulty in pulling this bed out of the wall; which ordinarily was no task for us at all. So we finally got the bed down and went to sleep with out clothes on . . . and was unconscious of anything else, headache or anything, until the next morning." They were awakened next morning by an electric alarm clock that rang "until you get up and turn it off." Plaintiff and Miss Lamb got up next morning about eight o'clock, and plaintiff testified that "as soon as

the air hit us we started vomiting;" that she (plaintiff) vomited "until about 9:30;" that she went to work, but "got there about 11 o'clock;" that when she arrived at her place of work her lips and face were swollen and blue, "had a blue tinge." She remained at the office of her employer until two or three o'clock when she was taken home by one of the employees. She said that she had been vomiting "all during the day." She went to bed arriving back at the apartment and "slept until the following morning," when she "again attempted to go to work," but was unable to work. She remained at her place of employment on this day, Saturday, until about eleven o'clock, when she fainted and a coemployee took her back to the apartment, where she prepared her lunch, but could not retain it.

According to plaintiff, she "developed a very persistent cough on Saturday," March 19th. Sunday morning, March 20th, Dr. Signorelli was called and plaintiff was taken to St. John's Hospital. Tuesday, March 22nd, she started menstruating, which was very painful. About four years and two years prior to March 17th, she had a painful menstruating period, but she said these were not so severe as after the alleged gas experience. Plaintiff was at the hospital about ten days when she went to her mother's home at Jennings in St. Louis County, where she remained during April. She went back to work the first or second week in May, and worked "a few hours a day," until she returned to the hospital "first week in June." The recurrence of painful menstruation was the occasion for return to the hospital. On this occasion she was at the hospital one week, and unconscious "much of the time." She had pains in the "lower abdomen and the right side" and was unable to stand. "I was kept under hypodermic needles all the time I was there." She returned from St. John's Hospital to her mother's home, and next morning went to the Lutheran Hospital, where an operation was performed by Dr. Hanser.

Miss Lamb, whose suit against defendant is "still pending," gave about the same version as to what occurred at the apartment as did plaintiff. She testified that "two or three days before March 17th," the refrigerator flame "was very indistinct. A sort of yellow color. . . . It was about 10 o'clock (night of March 17th) when we awoke—very stuffy, and I had a terrible headache; was very nervous and weak. . . . I could not think clearly; I vomited all morning long."

Ben Newman testified that he was in the employ of the Laclede Gas Light Company (which company sold this refrigerator to defendant); that his main work "as a service man was refrigerators and house heating;" that about March 19, 1932, he was sent to plaintiff's apartment; that defendant's manager, Mr. Levitt, said

"the refrigerator was out of order up in 304 and he said that one of the girls was made sick." Newman said that the refrigerator flame "had a slight yellow tip;" that the flue which "generates the heat" was slightly carbonized; that he "found lint in the screen" around the burner; that the mesh of the screen was real fine; that "the lint restricts the air from going in and mixing with the gas; that he cleaned out the carbonized condition of the flue and removed the lint. "Q. After you did that work what affect did it have on the burning of the gas, so whether or not it continued the same flame or a different flame? A. Well, it gives better combustion, made a blue flame." On cross-examination Newman testified: "Q. Did you say it is the lint on the screen that causes the yellow tip flame? A. That is right. Carbon on the screen does the same thing. The carbon collects in the flue from the yellow tip, and I brush off the carbon."

Edward McFarland testified that he was service manager of the refrigerator division of a hardware company for whom he worked; that he had "been engaged in that work for 14 years;" that he was familiar with the Electrolux refrigerator; that he worked for the manufacturer of this refrigerator in 1927 and 1928; that he was familiar with the model EA3A (the model in question); that the function of the screen was to filter the air; that the condition of the burner, etc., as given by witness Newman (presented in hypothetical question) would cause "an improper combustion of your gas, which will transform a blue flame to a yellowish flame, and cause carbon in the flue, which will, of course, throw off gas. Q. And what sort of gas will that throw off? A. Monoxide gas. Q. Carbon monoxide gas? A. Carbon monoxide gas." It developed on cross-examination of McFarland that his knowledge of gases was very limited, and he admitted that he had never made an analysis of gas resulting from a yellow flame, as appeared in the refrigerator in question. Defendant contended below and contends here that McFarland was not qualified to testify as an expert on the subject of carbon monoxide gas being formed by the refrigerator. We rule this question infra.

Dr. Signorelli examined plaintiff on Sunday, March 20, 1932, at St. John's Hospital, and testified: "Q. Did you make a diagnosis of her condition based on that examination? A. Yes, I did. Q. What was the diagnosis that you made? A. I made a diagnosis of carbon monoxide poisoning." Defendant says that Dr. Signorelli *admitted* that the symptoms he found *pointed* to a "definite diagnosis either of food poisoning, gas poisoning, or other type of poisoning." The record does not support the contention that Dr. Signorelli was so indefinite. On the cross-examination of Dr. Signorelli, the record shows: "Q. So your diagnosis of gas poisoning was based largely upon

the history that this patient gave you, and the fact that she told you that she suffered from gas poisoning; is that right? A. Just a minute. We take a history to complete our record, or to try to arrive at a diagnosis, but when you have a trend of symptoms correlated together, then, of course, you are pointing towards a definite diagnosis, either of food poisoning or gas poisoning, or some other type of poisoning. In this case, in my opinion, this thing was due to carbon monoxide poisoning, on account of the definite symptoms in the history, and the findings that were carried on.''

Dr. Hanser, who operated on plaintiff, testified that he found acute appendicitis, with evidence ''of old adhesions around the appendix;'' a swollen and inflamed right fallopian tube, with evidence ''of old inflammation;'' a ''rather recent or rather acute inflammation'' of the left tube with no evidence of old adhesions. Dr. Hanser, after having hypothesized to him plaintiff's experience from the time of the alleged carbon monoxide poisoning, was asked: ''Well, now, doctor, assuming all the factors which I have mentioned in my question to you previously, can you arrive at a definite opinion, or have you arrived at a definite opinion, in your own mind, as to whether the acute infection for which you operated upon Mrs. Ambruster, could or could not have had any connection with the condition from which she was found suffering on March 18th or 19th of 1932?'' Objection was made and the question was reframed: ''Q. I will ask you whether it definitely did, in your opinion, not whether it could, but whether it did, have any connection with the condition from which you found her suffering?'' Dr. Hanser answered: ''I would say very definitely, yes.''

Dr. Frank, who was present at the operation, in answer to a hypothetical question, said: ''If the patient suffered from acute carbon monoxide poisoning there is no question but what it could lower resistance and cause tissue changes that would aggravate an old infection. It is not the cause of the infection that is there, but it could be an indirect cause by aggravating an old infection; and that was very well demonstrated at the operation.''

Defendant used Dr. Harry G. Bristow and Dr. D. H. Diehr. The facts relative to the refrigerator, the room, etc., were presented to Dr. Bristow in an hypothetical question, and the answer was: ''In the first place, under such circumstances, it is entirely possible for theoretical amounts of carbon monoxide to be formed. I believe that it, that carbon monoxide could not possibly be formed in any other than theoretical amounts, and certainly not in such quantities as might be dangerous to life. In my opinion, there could not be any more carbon monoxide formed under those conditions than is usually formed in the ordinary smoking of a cigar. . . .''

Dr. Diehr examined plaintiff September 26, 1934, prior to her trial

on October 29th thereafter, and his evidence was to the effect that plaintiff was in a fairly good state of health; that he found nothing "subnormal or abnormal about" her.

Mr. Levitt testified that neither plaintiff nor Miss Lamb had ever called his attention "to any gas escaping" from the refrigerator; that he did not repair it; and that so far as he knew the janitor did "not service or repair" it. William Bailey, the janitor, who, it is charged, repaired the refrigerator, testified that he "had nothing to do with the refrigerators and did nothing to them."

■ Defendant contends that it did not agree to keep the refrigerator in repair and did not repair it or attempt to do so prior to plaintiff's alleged injury, but the question of repairing, under the evidence, was for the jury. If a landlord who is not under contract to keep the demised premises in repair, voluntarily assumes to repair such premises and then negligently repairs, "he is liable in damages for all injuries resulting from such negligence." [Lasky v. Rudman, 337 Mo. 555, 85 S. W. (2d) 501, l. c. 502, and cases there cited.] It cannot be said in the present case that there was no evidence that defendant attempted at least to repair the refrigerator, therefore, if the repair was negligent and plaintiff was injured as the result of such negligent repair, and free from negligence herself, then defendant would be liable.

■ The chief question on the demurrer to the evidence is whether there is substantial evidence tending to show that carbon monoxide gas escaped from the refrigerator in such an amount or quantity as to be dangerous. The burden to establish that such was the case was on plaintiff, and it is contended that under the evidence this question was for the jury. The evidence invoked is: (1) The evidence of Newman as to the condition of the refrigerator, the *yellow* tipped flame, etc.; (2) the experience of plaintiff after she fell asleep in the chair on the night of March 17th; (3) the opinion of McFarland as to the formation of carbon monoxide gas by the refrigerator; and (4) the diagnosis of Dr. Signorelli on March 20th. The opinion of McFarland is the *weak* link in the chain. Defendant vigorously urges that the opinion of McFarland is not of any probative force. If it is not, then there is no substantial evidence that carbon monoxide gas in dangerous amount escaped from the refrigerator. Dr. Signorelli's diagnosis is substantial evidence that plaintiff was suffering from carbon monoxide poisoning on March 20th, but if such be so, it still remained the burden of plaintiff to make a submissible issue on the question as to whether or not her condition was caused by carbon monoxide gas *from* the refrigerator. We stated, supra, that it developed on the cross-examination of McFarland that his knowledge of gases are very limited, and that he admitted that he had never made an analysis of the gas resulting

from a yellow flame, as appeared in the refrigerator in question. It further developed on cross-examination that he was a high school graduate; that he did not claim to be a chemical engineer, but stated that after he finished high school he "took up electrical engineering," and that he had studied "chemical analysis of gases," but that it had been "some years" since. "Q. Will you tell us the chemical formula for carbon dioxide? A. CO—carbon dioxide is M over CO. Q. Carbon dioxide? A. MO. Q. What does MO mean? A. Well, that is the chemical analysis for carbon monoxide and it is—I could not tell you just offhand now. Q. You do not know what the O stands for and you do not know what the M stands for? A. Well, it has been quite a while since I have studied it, but that is all. Q. Do you know what the chemical formula is for air, ordinary air that we breathe? A. $CO_2$; your C is for your, is the carbon and oxygen; and C and O is carbon and oxygen, and $_2$ is inhalation, I believe it is. . . . Q. Now, you said that you studied various kinds of gases that put people to sleep. A. Toxic gases. Q. Toxic gases? A. Which is a part of refrigeration studies. Q. Now, you have mentioned carbon monoxide as being one; and you think that the chemical formula for that is MO, is that right; but you do not know what the M stands for, and you are not quite sure what the O stands for, is that right? A. Quite right. I have not studied it for some years now. Q. Well, you have been working on it for sixteen years now, haven't you? A. No. Not on carbon monoxide, no. Q. On all these different kinds of gases? A. On all refrigerators; yes, sir. Q. All right. What other gas in connection with refrigeration is poisonous or puts people to sleep? A. Methyl chloride, sulphur. Q. What is that? A. Methyl chloride? Q. What is the chemical formula for that? A. $CH_3CL$. Q. $CH_3CL$. Now, will you tell us what that C stands for, and the H stands for? A. Well, I could not tell you right offhand; it has been so long since I have studied those. Q. So you do not know what the real chemical content of that gas is, do you? What the various elements of that gas are, the chemical elements of it? If you know, tell us; if you don't, say so. A. No. Not all of them, I do not. Q. Do you know the chemical contents of any other of these gases you have studied in connection with electrical refrigeration? A. Well, sulphur dioxide, $SO_2$. Q. $SO_2$, sulphur dioxide. Is there any sulphur dioxide used in this type of Electrolux refrigerator? A. No. Q. There is not. What does that $SO_2$ stand for? What does that mean? A. That is sulphur and hydrogen. Q. That is sulphur and hydrogen. $SO_2$ stands for sulphur and hydrogen? A. And oxygen? Q. And oxygen. Well, doesn't the $O_2$ mean that there are two atoms of oxygen? A. Oxygen. Q. Isn't that what that means? Does that refresh your recollection? . . . Q. Now, how do you know when you have one type

of gas and when you have another? A. Well, by the odor. Q. By the odor? A. Of the refrigerant. Q. Yes. And when there is no odor how do you tell it then? A. Well, if there is no odor, then you don't have any refrigerant. Q. You do not have any refrigerant? A. All refrigerants have an odor. Q. Well, I believe you stated a moment ago that when carbon monoxide gas escapes that you cannot smell it and cannot see it? A. I did. But it is not a refrigerant. Q. It is not a refrigerant? A. No, sir. Q. Now, do you know, do you profess to know to what extent carbon monoxide gas is discharged, if there happens to be some lint on this metal or screen of the Electrolux refrigerator, such as was described here to you a minute ago? A. You mean what percentage? Q. Yes. Have you ever made any test of the extent to which carbon monoxide gas is given off, if and when that tip is sort of yellow, the tip of the flame is sort of yellow? A. No, I could not tell you what percent carbon monoxide, but when you have a yellow flame you are not getting the proper combustion, which will throw off carbon monoxide. Q. You do not know whether it will throw it off in dangerous quantities or not, do you? A. Well, from what I have studied and learned about carbon monoxide, any amount of it is poisonous and destructive to the human system.''

■ ''Expert testimony is the opinion of a witness possessing peculiar knowledge, wisdom, skill or information regarding a subject matter under consideration, acquired by study, investigation, observation, practice or experience, and not likely to be possessed by the ordinary layman or an inexperienced person, and consequently who is incapable of understanding the subject under consideration, without aid of the opinion of some person who possesses such knowledge, wisdom, skill, practice or experience, and a person who is competent to give expert testimony is denominated as 'expert witness.' '' [McAnany v. Henrici, 238 Mo. 103, 1. c. 113, 114 (and cases there cited), 141 S. W. 633; Wolff v. Hartford Fire Ins. Co., 204 Mo. App. 491, 1. c. 499, 223 S. W. 810.]

It will be noted that Dr. Bristow, defendant's witness, testified from the hypotheses presented to him as to the refrigerator that it was entirely possible for theoretical amounts of carbon monoxide gas to be formed, but not in such quantities as to be dangerous. It will also be noted that McFarland stated that it was his opinion that carbon monoxide gas in *any* amount ''is poisonous and destructive to the human system.'' This last-mentioned opinion of McFarland was brought out by defendant on cross-examination, and defendant cannot complain on its *admission,* but its *probative* value was raised by the demurrer to the evidence. In Irwin v. St. L.-S. F. Ry. Co., 325 Mo. 1019, 30 S. W. (2d) 56, the witness has been in railroad work for thirty-five years; had been ''station agent, telegraph operator, train dispatcher, chief dispatcher, trainmaster, assistant superin-

tendent and fireman for a short time. He testified that he was familiar with the manner of working air brakes and how they are applied." It was held that such witness was not qualified to give an opinion as to "the time necessary to effectively apply" the brakes. "In order to qualify a witness to speak as an expert it is only necessary that the matter inquired of involves special knowledge or skill, and that he should satisfy the court that he is possessed of these qualities, either by actual experience or study." [Fisher v. Heitzeberg Packing & Provision Co., 77 Mo. App. 108, l. c. 113; Helfenstein v. Medart, 136 Mo. 595, l. c. 615, 36 S. W. 863; 22 C. J., p. 519, sec. 606. The qualification of an expert to give an opinion on a proper subject is largely in the discretion of the trial court (Thompson v. City of Lamar, 322 Mo. 514, 17 S. W. (2d) 960, l. c. 975; Adams v. Quincy, Omaha & K. C. Railroad Co., 287 Mo. 535, 229 S. W. 790, l. c. 795), but in view of the disclosure on cross-examination as to McFarland's *scant* knowledge of gases, and the further fact that he had never made an analysis of the gas resulting from a yellow flame in an Electrolux refrigerator, or similar analysis so far as appears, we are constrained to rule that he was not qualified to give an opinion on the question as to whether or not carbon monoxide gas in dangerous amount escaped from the refrigerator in question. And certainly he was not qualified to give his opinion that carbon monoxide gas in *any* amount "is poisonous and destructive to the human system." It may be conceded that plaintiff's evidence tends to show that something was wrong in the apartment, but there is no substantial evidence that carbon monoxide gas, in dangerous amount, was formed by the yellow tipped flame. If such flame in this kind of a refrigerator, and under the conditions obtaining, will cause the formation of carbon monoxide gas in dangerous amount, surely there are qualified experts who know or who can determine.

In view of the possibility of another trial we should dispose of defendant's complaint of *opinion* upon *opinion* in connection with the evidence of Drs. Frank and Hanser, and a part of the assignment on plaintiff's Instruction No. 1.

It is contended that the opinion of Drs. Frank and Hanser as to the *cause* of plaintiff's condition at the time of the operation, was based upon the *opinion* of Dr. Signorelli that plaintiff was suffering from such poisoning when he first saw her on March 20th, after the alleged gas poisoning on the night of March 17th, and *not* upon their own opinion formed from their own examination and observation or upon *hypothetical facts* in evidence presented to them. The hypothetical question asked Dr. Frank was in substance, as follows: Assume that plaintiff had a mild attack in the lower right quadrant of the abdomen four years prior to March 17, 1932, and a

second attack two years later; that on March 18, 1932, she was found to be suffering extreme drowsiness, weakness, headache, with constant and throbbing pains and aches over the entire body; had vomited about twenty times; her lips and nose were dry and swollen; her fingers were numb and tingling; *"and assuming that the condition was diagnosed by Dr. Signorelli as carbon monoxide poisoning or gassing;"* (italics ours) and assume that after spending seven days in the hospital she went to her mother's home in Jennings, where she remained for a month and then returned to her work; assume she was sent to the Lutheran Hospital June 12, 1932, at which time she complained of an acute pain in the right lower quadrant and more on the right than on the left side; assume that her trouble then was diagnosed as appendicitis and sulphengitis (salpingitis); and that thereafter she came to you and was examined by you; "I will ask you whether upon these facts you can base an opinion as to whether or not the acute sulphengitis (salpingitis) and appendicitis could have been directly traceable to the carbon monoxide poisoning, or rather to the symptoms of March 17, 1932?" Objection was made and the diagnosis of Dr. Signorelli was eliminated from the question, and Dr. Frank answered: "If the patient suffered from acute carbon monoxide poisoning there is no question but what it could lower resistance and cause tissue changes that would aggravate an old infection. It is not the cause of the infection that is there, but it could be an indirect cause by aggravating an old infection; and that was very well demonstrated at the operation." (Dr. Frank was present at the operation.)

The same hypothetical facts (not including the diagnosis of Dr. Signorelli) were in effect presented to Dr. Hanser, down to June 12, 1932, and then continued "from which point on, you observed her condition and performed the operation," and this question asked: "Can you form any opinion from that as to whether the conditions from which you found her suffering, and for which you operated on her for, could have been directly attributed to or in any way connected with all of these symptoms from which she was suffering on March 18th or 19th?" The answer was: "Well, I feel very definite that a condition like carbon monoxide poisoning, and which no doubt must have been established, a woman found in that condition must be due to some severe toxic condition; a doctor goes into that to find out what is causing it, and those symptoms, those group of symptoms would certainly fit in with carbon monoxide poisoning, unless you have something else to account for it; and that would be very difficult to find now." Dr. Hanser was further asked: "Well, now, doctor, assuming all the factors which I have mentioned in my question to you previously, can you arrive at a definite opinion, or have you arrived at a definite opinion, in your own mind, as to whether

the acute infection for which you operated upon Mrs. Ambruster, could or could not have had any connection with the condition from which she was found suffering on March 18th or 19th of 1932?'' and answered, ''Yes.'' And then this further: ''Q. I· will ask you whether it definitely did, in your opinion, not whether it could, but whether it did, have any connection with the condition from which you found her suffering? A. I would say very definitely, yes.''

We do not find merit in the contention that the *opinions* of Drs. Frank and Hanser were based on the *opinion* of Dr. Signorelli.

Defendant challenged plaintiff's Instruction No. 1 on the ground (among others) that it does not require a finding that defendant had knowledge of the alleged danger from the refrigerator. It was not necessary that plaintiff prove actual knowledge, hence it was not erroneous to omit such from her instruction. [Shaw v. Butterworth, 327 Mo. 622, 38 S. W. (2d) 57.] The Shaw case was for damages alleged to have resulted from a child falling from a window. A janitor, who was authorized to act for the owner, had defectively placed a screen in a window. In that case the court said (327 Mo. 622, 38 S. W. (2d) l. c. 62): ''We do not think it was necessary for the evidence to show that defendants actually knew of any defect. As a repair, improvement, or restoration of the condition of the building was made, defendants were liable, if they were negligent in any way, notwithstanding they may not have had actual knowledge of any defect.'' On this point defendant cites McLeod v. Linde Air Products Co., 318 Mo. 397, 1 S. W. (2d) 122, a suit against the manufacturer of an oxygen tank, and Wojtylak v. Kansas & Tex. Coal Co., 188 Mo. 260, 87 S. W. 506, a master and servant case, and other like cases. Also, Edwards v. Met. Street Ry. Co., 112 Mo. App. 656, 87 S. W. 587, a turntable case, is cited. But these cases are not in point. We do not think that plaintiff's Instruction No. 1 erroneous because it did not require a finding that defendant had knowledge of the alleged danger from the refrigerator.

It is not necessary to rule other assignments. The judgment should be reversed and the cause remanded, and it is so ordered. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur except *Douglas, J.,* not voting because not a member of the court when cause was submitted.