WOJTYLAK v. KANSAS & TEXAS COAL COMPANY, Appellant.

Division Two, May 16, 1905.

1. MASTER AND SERVANT: Knowledge of Dangerous Condition. It is necessary to the servant's right to recover, not only that he allege that the master knew or might have known by the exercise of ordinary care that the place where the servant was ordered to work was in a dangerous and unsafe condition, but also that the instructions require the jury to find such knowledge on the part of the master, and that the proof sustain the averment. It cannot be inferred from a showing that the servant, a miner, asked the foreman for props and was told by him that the mine was safe and to go to work, coupled with the fact that the roof on that day fell in, that the master knew the dangerous condition of the mine, or by the exercise of ordinary care could have known that it was dangerous.

2. ———: ———: Instruction: Instruction for Defendant as Cure. Where an instruction omits the necessary element of the master's knowledge of the dangerous condition of the place where his servant is ordered to work, the error of that omission is not cured by an instruction given for the defendant master which requires such knowledge as a necessary prerequisite to the servant's right to recover, for the two instructions are in conflict, and the jury would not know which to obey.

3. ———: **Instruction: Contradictory of Servant's Testimony.** The servant, a coal miner, testified unequivocally that he had never experienced any shortage of props except on the day of the accident, and the instruction authorized the jury to find "that prior to the day of the accident plaintiff had called upon defendant for props, and defendant had failed to supply them." *Held*, erroneous, and the error is accentuated by the fact that much evidence was introduced to show that there was a general shortage of props and that other miners had failed to get them when they had called for them prior to the day of the accident.

4. ———: ———: **Two Hypotheses.** A jury should not be authorized to find for plaintiff on either of two hypotheses, one of which is positively contradicted by his unequivocal testimony.

5. ———: **Degree of Care.** The owner of a mine is required to exercise ordinary care in furnishing his servant a reasonably safe place in which to work. The instructions should not authorize a finding for the servant for injuries received by him "even though the danger from said mine roof was not such as to threaten immediate injury, and the condition was such that under all circumstances shown in evidence a very prudent man might reasonably have believed it was safe for him to continue in such work until props were supplied to him."

6. ———: **Dangerous Condition: Doubt.** A requirement in an instruction to find that "on the morning of the day of the accident plaintiff felt in doubt about the safety of the mine roof and so reported to defendant and called for mine props" is not equivalent to an allegation in the petition that the roof was unsafe and that defendant knew it.

7. ———: ———: **Servant's Faith in Safety.** If the roof of the mine was unsafe, and its condition known to the master, the master's duty to provide the servant a reasonably safe place in which to work was not lessened by the fact that the servant had absolute faith in its safety.

8. ———: **Evidence: Res Gestae: Withdrawal: Unfair Practice.** Taunts of the pit boss for sending the injured miner to work in the pit where he was injured, and threats by other miners to whip him for doing so, made three-quarters of an hour after the roof had fallen in, are no part of the *res gestae*, and are wholly incompetent. And, though voluntarily testified to by a witness, yet if they are taken up by counsel and made the basis of other questions, and after objection are withdrawn, and then, after they are read by the stenographer, the jury are told to disregard them, the error in admitting them is not cured by the withdrawal and the court's direction. They are things that

influence verdicts, and while they may not of themselves be reversible error, yet the manner of getting them before the jury is unfair practice.

9. ———: ———: ———: Impeachment. The statement of another miner charging defendant's pit boss with not furnishing props to the injured miner and cursing him for being the cause of his injuries, made three-quarters of an hour after the accident, to which he made no reply, are no proof of the *res gestae*, are not competent as an admission of the defendant, nor competent for impeaching the evidence of the pit boss, since they relate to an impertinent and collateral matter; and all reference to them, either in the cross-examination of the pit boss, or in the testimony of other witnesses called to contradict him, should be excluded.

10. ———: ———: Release: Knowledge of Attorney. It is incompetent for an attorney to testify that he did not know that any release of plaintiff's cause of action had been obtained from him until after the suit was brought.

11. ———: ———: Loss of Wages. Where plaintiff in his petition has not counted upon loss of wages and loss of time, evidence of the value of his wages is not competent in chief, or in rebuttal of evidence to the effect that he was a skillful miner.

12. DAMAGES: Release: Pleading. The Missouri statute (sec. 654, R. S. 1899) permits a plaintiff suing for damages for personal injuries due to negligence, to assail a release pleaded in the answer, by alleging in the reply and proving that such release was fraudulently or wrongfully obtained.

13. ———: ———: Tender: Instruction. ·Where the tender to defendant of the amount paid plaintiff for release of his cause of action is made into court, and that is the tender relied on, the instruction should be so drawn as to fix that as the time and place of the tender, and not leave it to the jury to surmise whether or not plaintiff had made some other tender.

14. NEGLIGENCE: Props: Burden. Where the negligence charged is that the defendant mine-owner failed to furnish the plaintiff miner sufficient props for safety, the instructions should put the burden on plaintiff of showing a failure to furnish the props.

15. LIMITATIONS: Action Accruing in Another State. Where the Supreme Court of Kansas has held that the Statute of Limitations of that State does not apply to actions against a foreign corporation, the action of a plaintiff injured while working in Kansas for a Missouri corporation when brought in this State, is not, under sec. 4280, R. S. 1899, barred by the Kansas Statute of Limitations, for section 4280 permits the action to be barred

in this State only when it is barred by the laws of the State in which it originated.

16. **NEGLIGENCE: Miners: Contributory Negligence: Matter of Defense.** In a common law action for negligence brought by a miner against the mine-owner, contributory negligence is a defense. Cases based upon a violation of the mining act of the State where brought or of the State where the accident occurred, which allow damages for willful violations thereof, in which it has been ruled that contributory negligence of the miner is no defense, have no application to common law actions for negligence.

17. ————: ————: ————: **Question For Jury.** Where the evidence shows, in a common law action of negligence by a miner against the mining company for injuries received by the falling of the roof upon him, that plaintiff was an experienced miner, it is for the jury to determine whether or not he was guilty of contributory negligence in carelessly knocking out one of the props that supported the roof, and in failing to take proper precautions before he went to work to ascertain, by sounding or other examination, whether the roof was safe.

18. ————: ————: **Props: Evidence of Other Miners.** After plaintiff has testified that he had not needed props on any other day prior to the day of the accident to him, the court should withdraw the evidence of other miners to the effect that there was a general lack of props in their mining rooms.

Appeal from Jackson Circuit Court.—*Hon. Edw. P. Gates,* Judge.

REVERSED AND REMANDED.

*Daniel B. Holmes* for appellant; *W. C. Perry* and *Adiel Sherwood* of counsel.

(1) The demurrer to the evidence should have been sustained. Fuchs v. St. Louis, 167 Mo. 645; Agan v. Shannon, 103 Mo. 665; Grattis v. Railroad, 153 Mo. 403. (2) The court committed error in giving plaintiff's first instruction. (3) Prejudicial error was committed by the trial court in admitting the testimony of John H. Atwood, attorney for plaintiff, as to when that attorney first became aware that defendant claimed to

have plaintiff's release of the cause of action sued on.
Hambricht v. Brockman, 59 Mo. 52; Preston v. Rail-
road, 132 Mo. 111. (a) Gardner v. Railroad, 135 Mo.
100; Lumber Co. v. Roy, 126 Fed. 524; Warner v. Rail-
road, 62 Mo. App. 192; Frazer v. Railroad, 38 Pa. St.
104; Snodgrass v. Carnegie Steel Co., 173 Pa. St. 228;
Heaney v. Iron & Steel Co., 25 Sc. Sess. Cass. (4th Se-
ries) 903; 1 Labatt, Master & Servant, sec. 365a and
sub. 2, n. 2, p. 957; Davis v. Coal & Coke Co., 34 W. Va.
500; Beall v. Railroad, 38 W. Va. 525; Francis v. Rail-
road, 110 Mo. 387; Church v. Railroad, 119 Mo. 203;
Hudson v. Railroad, 123 Mo. 445; Railroad v. Finley,
12 C. C. A. 595; Railroad v. Reesman, 9 C. C. A. 20;
Russell v. Railroad, 47 Fed. 204; Hamman v. Coal &
Coke Co., 156 Mo. 243; Agan v. Shannon, 103 Mo. 665.
(b) Crane v. Railroad, 87 Mo. 595; Camp v. Heelan,
43 Mo. 591; Wade v. Hardy, 75 Mo. 394; Benson v.
Railroad, 78 Mo. 504; State ex rel. v. Sitlington, 51 Mo.
App. 256. (4) Reversible error was committed by the
trial court in permitting the plaintiff to prove a certain
incident and conversation with Tom Graham, the pit
boss, some three-quarters of an hour after the accident
happened. Meyer v. Lewis, 43 Mo. App. 422; Stephens
v. Railroad, 96 Mo. 214; Anderson v. Railroad, 161 Mo.
420. (5) Reversible error was committed by the trial
court in permitting plaintiff to prove that after the
accident happened one Pokelli said to the pit boss, "he
won't need the props what you did not send. Damn you,
you are the fault of his getting hurt." Adams v. Rail-
road, 74 Mo. 556; Ruschenberg v. Railroad, 161 Mo. 80;
Hamburger v. Rinkel, 164 Mo. 407; Roe v. Bank, 167
Mo. 426. (6) The trial court erred in permitting
plaintiff to prove his average earnings at the
mine in which he was injured. Coontz v. Railroad, 115
Mo. 673; Slaughter v. Railroad, 116 Mo. 274; Krueger
v. Railroad, 94 Mo. App. 458; Stoetzle v. Sweringen,
96 Mo. App. 594. (7) Plaintiff's second instruction

authorizing the jury to find that Thomas Graham was defendant's vice-principal should not have been given. Grattis v. Railroad, 153 Mo. 380. (8) The court erred in giving plaintiff's third instruction and in not giving the instruction asked by defendant numbered 8. Och v. Railroad, 130 Mo. 45; Harkey v. Ins. Co., 35 S. W. 230; Henderson v. Cass County, 107 Mo. 50; Ruppel v. Mo. G. and B. Assn., 158 Mo. 622; Furniture Co. v. Davis, 86 Mo. App. 300. (9) Reversible error was committed by the trial court in giving the instruction of its own motion numbered 1 instead of the refused instruction asked by the defendant numbered 9. Fuchs v. St. Louis, 167 Mo. 645; Agan v. Shannon, 103 Mo. 665. (10) The trial court erred in giving instruction numbered 2 of those given of its own motion and in refusing to give the instruction asked by defendant numbered 18, both of which pertained to the assumption of risk. Hamman v. Coal and Coke Co., 156 Mo. 244. (11) The plaintiff's suit is barred by reason of the Kansas Statute of Limitations. Kansas Stat. 1897, sec. 12, chap. 95; R. S. 1899, sec. 4280; Gen. Stat. Kan. 1889, sec. 4102; Finnell v. Railroad, 33 Fed. 427; Type Foundry Co. v. Jackson, 128 Mo. 119; Berkley v. Tootle, 163 Mo. 584. (12) The trial court erred in refusing to give instructions numbered 11, 13 and 16 on the subject of contributory negligence. (13) Error was committed by the trial court in submitting the validity of the release to the arbitrament of a common law jury. Art. 1, sec. 10, Const. of U. S.; 14th amendment, sec. 1, Const. of U. S.; art. 2, sec. 15, Const. of Mo.; art. 6, sec. 1, Const. of Mo.; State ex rel. v. Rombauer, 104 Mo. 619; Moore v. Railroad, 85 Mo. 596; Garland v. Railroad, 85 Mo. App. 579; Miller v. Railroad, 109 Mo. 356; Crispin v. Babbitt, 81 N. Y. 516; Deserant v. Railroad, 9 New Mex. 495; State ex rel. v. Rombauer, 105 Mo. 103; State ex inf. v. Shepherd, 76 S. W. 79; Railroad v. Brick Co., 85 Mo. 307; Jim v. State, 3 Mo. 147; Blunt v. Sheppard, 1 Mo. 219; Calloway v. State,

1 Mo. 211. (14) The damages awarded are grossly excessive and the result of passion and prejudice on the part of the jury. Whittlesey's Mo. Prac., 611; Furnish v. Railroad, 102 Mo. 438; Chitty v. Railroad, 166 Mo. 435.

*John H. Atwood, William W. Hooper* and *James A. Reed* for respondent.

(1) "Generally, a servant cannot recover for those injuries resulting from causes seen and known by him. But, even when there is no order to do a given act, there are some modifications of the general rule. Thus it is held in many cases, where the servant knowingly incurs the risk of defective machinery, still, if not so defective as to threaten immediate injury, it is for the jury to determine whether there was negligence on his part." Stephens. v. Railroad, 96 Mo. 209; Huhn v. Railroad, 92 Mo. 443; Shortel v. St. Joseph, 104 Mo. 114; Church v. Railroad, 119 Mo. 203; Hyatt v. Railroad, 19 Mo. App. 287. Both the pit boss and Wojtylak knew that the roof was unpropped. The pit boss, in our case, assured Wojtylak of his safety as the railroad boss did the workman in the Hyatt case, supra. Conroy v. Iron Works, 62 Mo. 35; Flynn v. Railroad, 78 Mo. 195; Hough v. Railroad, 100 U. S. 225. (2) If it should be urged that the contract between Wojtylak and the coal company was a Kansas contract and the law of the place of the making of the contract should control, our answer is, first, that the presumption is that the law of Kansas is the same as that of this State until the contrary is shown, and, second, that the most recent utterance of the Supreme Court of Kansas on this subject coincides with the Missouri doctrine. Railroad v. Moore, 29 Kan. 632; Mining Co. v. Robinson (Kan.), 73 Pac. 102; Coal & Coke Co. v. Beaver, 61 N. E. 335; Bowerman v. Mining Co., 71 S. W. 1062; Coal Co. v. Herbeck, 60 N. E. 105. The statute, in the

light of its interpretation by the Court of Appeals in
the case of Bowerman v. Mining Co., 71 S. W. 1062, is
controlling in this case. (3) After Graham had been
informed by Wojtylak that props were needed in his
room and that he was fearful that the roof would fall,
Graham made no pretense of examination, but directed
Wojtylak to go into his room to work and assured him
that he could do so safely. It is not enough to say,
he did examine it the day before and found it all right.
When applied to, as he was by Wojtylak, it became his
duty to make such an examination as would enable him
to know, or have good reason to believe, that he was
speaking the truth, before he made the positive state-
ment about the absence of danger. (4) Appellant con-
tends that we could not sue because the claim had been
extinguished by operation of the Kansas statute. This
contention is upset by the case of Williams v. Railroad,
74 Pac. 600, decided by the Supreme Court of Kansas,
which distinctly holds that, under circumstances like
those in this case, the action against a foreign corpora-
tion is not barred.

GANTT, J.—This is an action for personal injur-
ies, begun in Jackson County Circuit Court, the acci-
dent out of which the injuries arose occurred at Leav-
enworth, Kansas, on July 9, 1894. The defendant com-
pany at the time of the accident, and for years prior
thereto, was the owner of and operated the Riverside
coal mine located at Leavenworth, Kansas. The plain-
tiff was injured in said mine on July 9, 1894, by the
falling of the roof of the mining room in which the
plaintiff was employed. His injuries were to the lower
part of the back and spinal column, which resulted in
paralysis of his lower limbs. He was forty years of
age at the time of the accident.

The plaintiff was a native of Poland, but had re-
sided for a number of years prior to the accident, and

ever since, at the city of Leavenworth, Kansas. He emigrated to this country in 1887, and first located in Colorado, and after working about two months on the railroad began working in a coal mine. He worked at coal mining a year in Colorado, and then came to Leavenworth and went to work in the Riverside coal mine, and was continuously employed therein until he was hurt in 1894.

On the part of the defendant it is insisted that he was a miner of extended experience and understood his duties and the dangers of his occupation. On the part of the plaintiff it is contended that his mentality was very slight and that he had never become a skillful miner. There is little or nothing to show that he was other than a man of ordinary capacity and of sufficient intelligence to understand the nature and character of his duties and the dangers of his occupation. He was able to speak and understand the English language fairly well.

The amended petition, on which the cause was tried, alleged that the defendant was a corporation under the laws of Missouri, with its principal offices in Kansas City, and was the owner of the said Riverside coal mine in or near Leavenworth, Kansas; that the various strata, rock, earth and slate, constituting the roof of the said mine, was so situated and formed that in order to render employment in said mine reasonably safe it was at all times necessary that said roof should be supported by numerous props or braces, and that unless so supported large portions of rock, earth and slate were liable to be precipitated upon the workmen engaged therein. That it was, and for a long time had been the custom of the defendant to furnish props or braces to the miners, and that it was the duty of the defendant to furnish said props or braces in sufficient numbers, and to see to it that the roof or top of said mine was properly supported, and prior to the ninth day of July, 1894, the plaintiff was, and had been in

the employ of the defendant as a coal miner, and on said last-mentioned date was ordered and directed by the defendant to enter said mine and engage in his usual and customary employment. That several days prior to the said ninth of July, 1894, and on said date, defendant had carelessly and negligently failed and neglected to furnish plaintiff a sufficient number of props with which to support the roof of said mine, and that said roof at the point where plaintiff was ordered to work was and had been in a dangerous condition, and that it was composed of slate, shale and earth requiring constant and strong support by wooden props or braces to prevent its falling, and because it was likely at any time to become loosened and fall unless so supported, and defendant had failed to provide such supports or to furnish them to the plaintiff, or to have them put in proper place so as to sustain the roof of said mine, all of which was known to the defendant. That the plaintiff a sufficient number of props or braces and to see had complained to the defendant on account of the insufficient number of props furnished and the inadequate support sustaining the roof of said mine and the danger arising therefrom, and that the defendant had repeatedly promised and agreed to furnish the plaintiffs a sufficient number of props or braces and to see to it that the roof of said mine was properly supported, but that the defendant carelessly and negligently failed to comply with its said promises.

Plaintiff further states that, when he notified the defendant of the dangerous condition of said mine, the said defendant assured him, through its foreman, who was the authorized representative and vice-principal of defendant, in charge of the work in said mine, and a person skilled in the business of mining, that he could enter said mine and work therein in perfect safety, and ordered the plaintiff to enter said mine and to proceed with his labors therein, assuring plaintiff that it was perfectly safe for him so to do, and that by reason of

said assurances from the defendant, the plaintiff was led to believe that it was reasonably safe for him to enter said mine and continue his labors therein. That on said ninth day of July, 1894, while engaged in his customary and usual labor in said mine, in the manner and at the place directed by the defendant, and while in the exercise of due care and caution on his part, a large quantity of rock, earth and slate which had been insufficiently supported, fell from the top or roof of said mine, upon the plaintiff, striking him, the said plaintiff, in the lower part of his back, fracturing the spinal column, injuring the spinal cord, and greatly injuring and destroying the sensor or motor nerves, so that he had neither sensation or feeling, nor power to move his body below the waist, and otherwise injuring him in and about the body, so that he has in a great measure lost control of the natural functions of his body, and thus and thereby his health has been destroyed, and he has become a permanent invalid and cripple, and is wholly unable to perform any kind of labor; that he has suffered, and will continue through life, and great bodily pain and mental anguish, and will never in the future be able to earn a livelihood; that he has been put to great expense for medical attendants and nurse hire, and for the purchase of drugs and medicines and in payment of attendants, to-wit, the sum of $50, and has been wholly deprived of the capacity and ability to earn a livelihood in any manner, all of which has been true ever since said injury was received.

The plaintiff further states that all of said injuries were occasioned by the carelessness and negligence of the defendant in failing to furnish to plaintiff a sufficient number of props or braces to support the roof of said mine, to-wit, thirty in number, and in failing to perform its duty to furnish said props, and in failing to conform to the custom and usage to furnish props in said mine, and in carelessly and negligently failing to

cause the roof of said mine to be properly supported, either by wooden props or braces, or otherwise, whereby the roof of said mine was caused to fall upon the plaintiff, and in carelessly and negligently allowing said mine to be in a dangerous and hazardous condition as aforesaid; and in carelessly and negligently ordering and directing the plaintiff to enter said mine when it was in a dangerous condition; and in assuring the plaintiff that he could enter said mine and labor therein with safety to himself, and in ordering the plaintiff to proceed without necessary props and while said mine was in a dangerous condition; all of which the defendant knew and all of which was careless and negligent, and all of which endangered the life and limb of the plaintiff and occasioned and brought about the injuries as heretofore set forth.

Plaintiff states that by reason of said injuries occasioned by the carelessness and negligence of the defendant, as above set forth, he has been injured as aforesaid, and that he has been damaged in the sum of $25,000, for which he prays judgment, together with his costs.

The answer was a general denial and five other special defenses.

First. That on October 15, 1894, the plaintiff voluntarily made, executed and delivered, for a valuable consideration, a release, acquittance and discharge, whereby he released the defendant of and from all claims and demands of every kind for the injury received by him in said mine on July 9, 1894.

Second. An assumption of the risks from the falling of the roof in said mine, plaintiff being at the time an old experienced coal miner and well understanding the perils thereof.

Third. A plea of contributory negligence in taking down and removing one of the props which supported the roof of his room.

Fourth. That the negligence, if any, which caused

plaintiff's injuries was that of a fellow-servant of the plaintiff.

Fifth. A plea of the Statute of Limitations of the State of Kansas, and section 6779a, Laws 1899, p. 300, approved May 24, 1899, whereby, whenever a cause of action has been fully barred by the laws of the State in which it originated, said bar shall be a complete defense for any action brought thereon in any of the courts of this State.

The reply generally and specifically put in issue all of these several defenses.

The facts developed on the trial that the defendant's mine was about six hundred feet deep, and was entered by means of a deep shaft through which the miners were let down in cages. Long entrances or tunnels were run through the ground, known as main entries, through which cars were drawn by mules, driven by an employee known as the driver, for the purpose of hauling the coal when mined to the foot of the shaft, and also for the purpose of taking supplies from the shaft to the working places of the miners. From these main entries other small tunnels or entries were made through the mine at an angle of about forty-five degrees from the main entry and substantially parallel with each other; some fifty or more feet apart and off of these smaller entries, the rooms or chambers in which the miners did their work, were driven, and the coal mined from them. The plaintiff in this case was the exclusive occupant of one of these rooms, with the exception of a helper which he sometimes had, and the room which he had thus occupied for some time was the one in which the accident out of which this cause arose occurred.

The defendant company had a pit boss by the name of Thomas Graham, who employed and discharged the men who worked under the ground, and who had charge of these underground workings of the defendant. The plaintiff was not paid by the day or the month, but

furnished his own tools, and was paid so much per bushel for such coal as he mined. The vein of coal was from thirty to thirty-six inches in thickness, and the roof of the mine consisted of rock or slate which, when the coal was taken out, was supported, whenever necessary, by props, consisting of short pieces of timber from two to six inches in thickness. A fire boss was also maintained, who entered the mine about four o'clock each morning with a safety lamp, and visited all the rooms of the mine for the purpose of detecting the presence of explosive gas.

Among other rules enforced at the time of the accident were the following:

### "THE WORKING PLACE OF THE MINER.

"All miners working in any room will understand their working place in said room to be from the point of its turning off of the entry, to the face of the same. All necessary props and timber will be furnished him promptly on his calling for them, and he will be *required to keep his room in a safe condition, and under any and all circumstances he is forbidden to work in a room where he thinks there are any unsafe places.* The working place of a miner in the driving of an entry is from the face of the entry back to the point of last measurement, and he is required at all times to keep said working place securely propped.

### "DRIVERS' DUTIES.

"They are required to have their mules properly cleaned and harnessed ready for work on the blowing of the whistle at seven a. m. Any driver who does not give his mule proper attention and good treatment will be subject to dismissal. It is the imperative duty of drivers to bring any props and timber promptly whenever requested to do so by any miner working in rooms, entries or on pillars from which he is hauling his coal. If the driver fails to furnish props for timbering promptly when requested he will be subject to dis-

Vol 188 mo—18

missal, and the miner must immediately notify the pit boss of such refusal or neglect, and stop working in said place or places if considered unsafe until timber for propping is furnished."

The evidence tended to show that it was the custom of the miners, before leaving their rooms at the close of each day's work, to support with props the mine roof which had been exposed and likewise when he entered his room in the morning to test his roof for the purpose of discovering whether any dangerous condition not theretofore observed had developed during the night of his absence from the room. There was no rule as to the number of props that should be employed to support a certain amount of roof; this was largely determined by the miner himself, owing to the character of the roof, and by himself tapping and sounding the same. While there was evidence tending to show that there was a scarcity of props for some time, perhaps a week or two before the accident occurred, the plaintiff himself testified that only on that one day was there any insufficiency of props as far as his room was concerned; that he had worked in this room the day preceding the accident. He testified:

"Q. Now state to the jury, Kasper, whether or not this shortage of props there, or their failure to supply you with props, had continued for a number of days prior to the day that you were injured, or was it only on *that* day? A. Only one day there were not props enough."

Plaintiff further testified that he saw nothing that could be dangerous on that morning, that he was not on that day digging for new coal, or uncovering any new roof by his working, but that he was simply cleaning up old coal which had remained in this room for some time.

The testimony on this point is as follows:

"Q. Now the place that fell on you, was it old roof or new roof? A. Old roof.

"Q. The coal had been out from under that roof for some time, had it, or had it not? A. There was no mining done in the place for some time.

"Q. Ask what was he doing that day he was working there? A. There was a pile of coal, and he was trying to remove it, or arrange it some way or other in the place. It was old coal that was lying there for some time, he said."

Testimony on the part of plaintiff tended to show that on the morning of July 9, 1894, the plaintiff went down to his work, the pit boss not yet being in the mine; instead of going to his working place, he waited, in company with several other miners, to see the pit boss in relation to the props needed in his room; that about seven o'clock the pit boss appeared and was told by plaintiff that he needed props in his room, and that he feared the room was not safe; that plaintiff said to Mr. Graham, the pit boss, "I need some props in the place," and Graham said, "You go in there and work, there is no danger." The plaintiff's account of this conversation is as follows: "I say, 'Mr. Tom, I want the props,' and Tom says, 'No props;' I said, 'May be the roof fall on me sometime, I need props;' 'and he says, 'Go to work; do not fool awhile. The roof is all right; there is no danger; I send to you; the driver comes now on the first trip, and I send the props right away when he comes to your room, he will bring your props.' " He further testifies that no props were sent in that day, and that he believed that the roof was safe, and that there was no danger; that he believed that the pit boss knew better than he did. This conversation occurred about seven o'clock in the morning, and the roof fell on him and he was hurt about four in the afternoon. That he did no mining that morning, that is, dug down no new coal in his room, and had not uncovered any new roof that day.

The evidence was further that a large quantity of dirt and rock fell on the plaintiff, striking him on the

back near the hips, and so injuring him as to make
him a cripple for life, paralyzing his limbs so that he
could not walk, and the nerves controlling his bladder
and bowels.  He was confined to his bed for a year
and since that time his only means of getting about has
been in a wheeled chair.  On the part of the defendant
the evidence discloses that while he was seriously in-
jured, since his injury he had become the father of
three children.

The facts in regard to the releases and in regard
to the admission of evidence of which the defendant
complains, and the several instructions, will be noted
in the course of the opinion in the discussion of the
several assignments of error.

The grounds of negligence upon which this action
is based are, first, ''in failing to furnish to plaintiff a
sufficient number of props or braces to support the roof
of said mine, to-wit, thirty in number, and in failing
to perform its duties to furnish said props and in fail-
ing to conform to the custom and usage to furnish
props in said mine, and, secondly, in carelessly and neg-
ligently failing to cause the roof of said mine to be
properly supported, either by the wooden props or
braces or otherwise, whereby the roof of said mine
was caused to fall upon the plaintiff, and in carelessly
and negligently allowing said mine to be in a danger-
ous and hazardous condition as aforesaid, and in care-
lessly and negligently ordering and directing the plain-
tiff to enter said mine when it was in a dangerous con-
dition and in assuring the plaintiff that he could enter
said mine and labor therein with safety to himself and
in ordering plaintiff to proceed without necessary
props while said mine was in a dangerous condition, all
of which defendant knew and all of which was care-
lessness and negligence.''

On the part of the plaintiff the evidence tended to
show that in so far as his own room was concerned
there had been no lack of props up to the morning of

the day on which he was injured, as far as his judgment went. That on that day he was not engaged in taking down any new coal or uncovering any new roof which would require additional props. That he was simply engaged on that day in removing and arranging in some way the old coal which had already been dug down, but it does appear that for some reason the plaintiff was apprehensive that the roof might fall on him some time and, therefore, on that morning about seven o'clock he waited at the foot of the shaft to see the pit boss, Mr. Graham, and told him that he needed props, and according to the evidence of himself and two other miners, Gorski and Gontarewitz, he notified Mr. Graham, the pit boss, that he needed props, whereupon he was assured by the pit boss that the roof was all right, that there was no danger, and to go to work, that he would send props to him, that the driver was coming now on his first trip, and he would send the props right away; that in fact no props were sent that day and that in the afternoon about four or five o'clock a portion of the roof of his room did fall upon the plaintiff, crippling and injuring him, as before stated. He did not complain that props had not been supplied to him up to that time, and testified that he had never experienced any shortage of props except on that day. Why the plaintiff anticipated any danger from the falling of the roof does not appear, inasmuch as he testified that on that morning he saw no indications of anything being dangerous, nor was there any evidence from any one else that the roof had been examined and found to be dangerous or suspicious. All that appears is that he gave this notice to the pit boss and as a matter of fact a portion of the roof did fall, and that the pit boss did not prior to the injury to plaintiff go into this room and examine it. There was no evidence tending to show that, if the plaintiff had received additional props on that day, he would have propped the mine before cleaning up the old coal, unless the inference can

be drawn from the fact of his having expressed a fear that it might fall, but inasmuch as he himself testified that he saw nothing dangerous it is doubtful, at least, whether he would have so used the props had he received them. The custom and rules of the mine require him to look after the safety of his room and keep it safely propped, but the insistence of his counsel is that he was not the sole judge of the necessity of additional props, and that he had a right after notifying the pit boss about his apprehension of danger to rely upon the superior knowledge and judgment of the pit boss, whose duty it was in behalf of the company to furnish plaintiff a reasonably safe place in which to work, and that, having been assured that it was safe and directed to go to work, it was negligence in the company not to have inspected the room and discovered the dangerous condition of the roof. This is not statutory action under any mining act. The statute of Kansas was not introduced, nor was the petition predicated upon the statutory requirements thereof.

It is a common law action for negligence, and the duty of the defendant was to furnish a reasonably safe place. It cannot be said that the mere falling of the roof was of itself sufficient evidence of negligence to entitle plaintiff to recover.

On the part of the defendant the contention is that the notice which plaintiff gave to the pit boss of his desire and need for props that day was simply to prop the roof which he expected to uncover that day, and that as he did not uncover any new roof that day, the failure to furnish props had in fact no causal connection with the injury which he received by the falling of the old roof, and that as he had not suffered for want of props up to that day, the presumption must be that up to that time and as far as he had gone the roof had been sufficiently propped. To this the plaintiff answers, that it is evident that the old roof was not sufficiently propped from the fact that it fell, and that the

witness who cleaned the debris away after plaintiff was injured found no props beneath the mass of material that had fallen upon him, and that it was a plain duty of Graham, the pit boss, to have examined the roof that morning and ascertained that it was reasonably safe, and that when he told plaintiff that his room was safe he either knew that it was not safe or knew nothing about it. And if he bade him go to work, telling him he could do so without danger, without knowing whether that statement was true or not, and without having tried to find out, when as a matter of fact the roof was dangerous, he was guilty of negligence. In this conflict it becomes essential to examine the instructions given by the court for the plaintiff, and those denied the defendant.

I. For the plaintiff the court gave the following instruction:

"1. The jury are instructed that, if they believe from the evidence that the plaintiff, Wojtylak, on or about July 9, 1894, was in the employ of defendant as a miner in its coal mine near Leavenworth, Kansas; that it was the business of defendant, under the terms of such employment, to furnish plaintiff and keep him supplied with props to be used by him in supporting thereof that part of the mine where plaintiff worked; *that prior to said day plaintiff had called for such props and defendant had failed to furnish them;* that one Thos. Graham was the pit boss in said mine and vice-principal of the defendant, as elsewhere in these instructions defined; that said Graham was an expert and possessed of superior skill and experience in all matters pertaining to the underground working of said mine, as conducted by defendant, and that under the terms of such employment and the usages of said mine said Graham was empowered to and did, when called upon by the miners so to do, decide upon the safety of any and all portions of said mine, and then was, and

for sometime prior had been, held out to plaintiff by defendant as the proper person to decide upon the safety of said mine and of the portions thereof wherein the plaintiff was assigned to work; that on the morning of said day plaintiff felt in doubt about the safety of said mine roof in his working room, or chamber, and so reported to said pit boss and called for more props; that said pit boss thereupon told plaintiff to go on with his work, that there was no danger and he would supply plaintiff with props before they were needed; and that plaintiff did not have a sufficient amount of props at that time; that plaintiff thereupon went to his usual working room, or chamber, and continued his work and that in so doing he relied upon such assurances from the defendant's pit boss (if such were in fact made), and believed he was safe in resuming his work at the place indicated; that the danger from said mine roof was not such as to threaten immediate injury and the condition was such that under all the circumstances and facts shown in evidence a very prudent man might reasonably have believed it was safe for him to continue in such work until props were supplied to him; that the defendant failed during said day to supply to plaintiff any props for his use, and during the afternoon of said day and while the plaintiff was engaged at his usual work, at a point some distance back from the mine face and under a point from which the coal had been taken previous to that day, and without any fault or negligence on plaintiff's part, a large section of said mine roof caved or fell in upon plaintiff, causing the injuries complained of and shown in evidence; that if defendant had supplied plaintiff with props, said mine would have been supported, and such injury averted—*if you find these facts* from the evidence in the case, your verdict will be for the plaintiff, unless you further find from the evidence that plaintiff thereafter released defendant

·from any and all claims for or on account of such injuries, as elsewhere in these instructions defined.''

In the determination of the correctness of this instruction it must be borne in mind that the petition made the necessary averment that ''the·said roof at the point where plaintiff was ordered to work was and had been in a dangerous condition which was known to the defendant.'' While the dangerous condition of the roof is made an essential prerequisite of a finding of negligence on the part of the defendant, this instruction nowhere requires the jury to find from the evidence that the roof either was or had been in a dangerous condition or that any such dangerous condition was known to defendant. We think this omission renders this instruction fatally erroneous. While it is true that it requires the jury to find that plaintiff felt *in doubt* about the safety of the mine and so reported to the pit boss, and that the pit boss told plaintiff to go on with his work, that there was no danger, and that part of said mine roof caved and fell upon the plaintiff, it does not require the jury to find that defendant either knew or might have known by the exercise of ordinary care. that the mine was in a dangerous and unsafe condition, and without this proof plaintiff cannot recover.

If the mine was not in a dangerous condition already the exercise of ordinary care by the defendant would not have discovered that it was and the defendant was not liable simply because the pit boss directed the plaintiff to go to work therein. In Crane v. Railroad, 87 Mo. l. c. 595, in which the plaintiff sued the defendant for negligence in furnishing a defective and unsafe car, NORTON, J., speaking for the court, said: ''To sustain the allegation in the petition that defendant negligently furnished a car that was defective and unsafe, the plaintiff would be required to prove the fact that the car was unsafe; and, also, the fact that defendant either knew, or, by ordinary care, might have known of the defect, because without such proof the

charge of negligence would be unsustained.'' This in-struction while evidently intended to cover the whole case is chiefly predicated upon the negligent act of the pit boss in assuring plaintiff that the mine was safe, whereas it was dangerous, and in ordering plaintiff to go to work therein, and thus deceived the plaintiff about the true condition of his room. To sustain, this instruction learned counsel for the plaintiff refer us to Shortel v. St. Joseph, 104 Mo. 114, as rendering unnec-essary the proof that the room was in fact unsafe, but by reference to that case it will be observed that the instruction, found on page 119 of the report of the said case, requires the jury to find not only that the engi-neer assured the workmen that it was perfectly safe to go under the section of the sewer, but required them further to find that ''*in point of fact it was not safe,* and that the plaintiff was unskilled in the matter of safety or unsafety thereof.'' That case is in line with what was said in Crane's case, and what we have just held was an essential fact to be found by the jury in order to justify the verdict for the plaintiff. Nor is this instruction cured by instruction number 14, given on behalf of the defendant in these words: ''You are further instructed that if on the morning of the day of the accident that roof of plaintiff's room in the mine was in good condition and safe and there were no indi-cations of any part thereof falling to be discovered by an ordinary careful examination thereof, and the plaintiff made no examination of said roof thereafter, then the plaintiff cannot recover in this action, and your verdict must be for the defendant, and this is the law even though you may further believe from the ev-idence that the plaintiff requested props of the pit boss on the morning of the day of the accident and failed to get them, and that the pit boss at that time ordered him to proceed with his work in said room.'' This in-struction in behalf of the defendant merely undertakes to present a phase of contributory negligence, and no-

where attempts to advise the jury what facts it was necessary for the plaintiff to prove before he could recover. Plaintiff's instruction is a very long and general one and concludes with the direction that, "If you find these facts from the evidence in the case your verdict will be for the plaintiff." This being so, the giving of a proper instruction for the opposite party could not have the effect of correcting the error, as the two would be in conflict, and the jury at a loss to know which to obey. If the plaintiff's said instruction had fully covered all the necessary facts which the jury must find and the defendant's instruction had required the finding of a fact which was not necessary and thus had been more favorable to the defendant than the law allowed, then defendant could not have complained, but such is not the case with the instructions under review. [State v. Herrell, 97 Mo. 105; Gay v. Gillilan, 92 Mo. 250; Frederick v. Allgaier, 88 Mo. 598.]

The jury might well have concluded under plaintiff's instruction that it was not at all necessary to have found that the roof of the mine was in fact dangerous, and that the defendant knew, or by the exercise of ordinary care could have known that it was, but that the mere fact that defendant's pit boss ordered the plaintiff to go to work therein, coupled with the fact that the part of the roof did fall, was all that was necessary to entitle plaintiff to a verdict.

Moreover, this instruction authorized the jury to find "that *prior* to said day plaintiff had called upon defendant for such props, and defendant had failed to furnish them." Now, there was absolutely no evidence of any demand by the plaintiff upon the defendant to furnish such props, or that the defendant had failed to furnish them on any day prior to plaintiff's injury; on the contrary, the plaintiff testified unequivocally in answer to a question propounded by his own attorney on direct examination that he had never experienced any shortage of props except on the very day of the acci-

dent. It was error to submit such a state of facts as this and the jury might have well concluded that they were authorized to find a previous demand and denial of the props, although plaintiff testified that he had not been short of props on any other day. Particularly so, as a large mass of evidence was admitted to show that there was a general shortage of props and that *other miners* had failed to get them when they had called for them *prior* to the day on which plaintiff was injured, and this error is accentuated by a further clause in this instruction which tells the jury "that if the defendant had supplied plaintiff with props said mine roof would have been supported and such injury averted." It is plain that these last-quoted words refer to the former clauses of the instruction which is predicated on *two* separate and distinct alleged failures of the defendant to supply props, one *before* the day of the accident, and the other, *on the day* of the accident, and a verdict is authorized for either of such failures, and as the jury is allowed to find upon either hypothesis, if one is without evidence to support it, how can it be said upon which the jury rested their verdict, especially when plaintiff had testified that he had experienced no shortage of props previous to the day of the accident?

The measure of care required of the defendant and its pit boss was to observe ordinary care in furnishing plaintiff a reasonably safe place to work, and yet the instruction authorized plaintiff to recover if they should find the further facts recited in his favor, even though "the danger from said mine roof was not such as to threaten immediate injury, and the condition was such that under all circumstances shown in evidence a very prudent man might reasonably have believed it was safe for him to continue in such work until props were supplied to him." Now, the degree of care which would be exercised by a very prudent man is the highest degree of care known to our law, and thus impliedly, at least, the defendant would have been lia-

ble although the exercise of ordinary care by its pit boss would not have discovered the danger of said roof falling.

Again, the instructions submitted to the jury whether ''on the morning of said day plaintiff felt *in doubt* about the safety of the mine. roof in his working room or chamber, and so reported to said pit boss.'' The petition alleges that the roof was unsafe and that defendant knew. it, and instead of requiring the jury to find these allegations the instruction substituted the fact that plaintiff felt in doubt about the safety, etc. The requirements of the instruction are not equivalent to the allegation of the petition on this point. It would be altogether possible for the roof to be perfectly safe and known to be so by the defendant, and yet, for the plaintiff to have doubts as to its safety and. his doubt known to the defendant; on the other hand, if the roof was in fact unsafe and its condition known to defend-- ant, defendant's duty would not have been lessened because the plaintiff had absolute faith in its safety. Under the petition the defendant's liability is based upon the fact of the unsafety of the roof and its knowledge of such condition and not merely upon the plaintiff's apprehension of danger.

II. It is insisted that reversible error was committed by the trial court in permitting the plaintiff to prove a certain incident and conversation with Thomas Graham, the pit boss, some three quarters of an hour after the accident happened. When the witness Gontarewitz was on the stand, he was asked: ''Did you see Kasper [the plaintiff] when he was taken out? A. Yes, sir. Q. Did you see him before he was taken from the mine, taken up to the top? A. Yes, sir; there was Jim and that other fellow that died, was going to fight with Tom Graham. He told him, 'See now what you get for telling him to go to work.'' As this answer in regard to Gorski and the other fellow going to fight with

Tom Graham and what Gorski said, was clearly not responsive to anything suggested by the question, the counsel for the defendant immediately objected to it, whereupon counsel for the plaintiff insisted that it was a part of the *res gestae*. Thereupon the court made a lengthy inquiry into the length of time that had elapsed after the plaintiff's injury before Gorski and the other fellow wanted to fight with the pit boss, and it was developed that it was a half to three quarters of an hour afterwards, and after this matter had been thoroughly gone into and the fact that Jim Gorski was going to fight with Graham was fully developed, counsel for the plaintiff announced he would withdraw the statement made by witness. Thereupon the court inquired what was the statement, whereupon counsel for the defendant objected to reading the statement on the ground that it had been improperly injected into the case. The court overruled this objection, and required the stenographer to read the statement, which he did, as follows: "Yes sir, there was Jim and that other fellow that died, was going to fight with Tom Graham. He told him, 'See now what you get for telling him to go to work.'" After it had been read, the court then directed the jury to disregard the statement, to which ruling of the court the defendant at the time duly excepted. Thus plaintiff was permitted to prove that three quarters of an hour after the accident occurred some of the fellow workmen of the plaintiff were so enraged at the pit boss "that they wanted to lick him for sending plaintiff in there," which is the expression used by one of the counsel in putting one of the questions, and "that Jim was going to fight with Tom about it," which was used in putting another question, and also to prove that one of the workmen said to the pit boss, "See now what you get for telling him to go to work." After having gotten this damaging testimony before the jury, both in the questions of the counsel and by the answers of the witnesses, the counsel of-

fered to withdraw the statement made by the witness, and then the stenographer was required to read it in full to the court in the presence of the jury. While unquestionably it is proper for the court to withdraw from the consideration of the jury incompetent testimony which has been inadvertently admitted, and such withdrawal will ordinarily have the effect of curing the error, as this case must be reversed on other grounds, we have no hesitancy in saying that the admission of this evidence was obviously erroneous, and very damaging, and the iteration and reiteration of the damaging expressions by counsel and the stenographer, was not cured by the effort of the counsel to withdraw it, and the direction to the jury to disregard it. It was no part of the *res gestae* and was utterly incompetent. In view of the very large verdict obtained by the plaintiff, we are much impressed with the fact that this evidence contributed in no small degree to the amount of the verdict. There is every probability of the jury having been influenced by it. While it may not of itself have been a reversible error, the manner of getting it before the jury must be considered unfair practice.

The admission of this evidence cannot be defended on the ground that it was volunteered by the witness. It is true it was wholly irresponsive to the question first asked him, but when the substance of the objectionable answer was adopted and twice incorporated immediately in other questions by counsel for plaintiff, and after defendant had called the court's attention to its incompetency, it cannot be justified as a mere inadvertence.

III. A kindred assignment of error is that which is based on the question propounded to Thos. Graham, the pit boss, when he was on the stand. After calling his attention to certain miners who were present at the foot of the shaft, whither they had brought plaintiff after he was hurt, he was asked: "Q. Now, then, I will

ask you, if, at that time and place a charge was not made to you by one of these men that his [plaintiff's] injury was the result of your failing to supply him with props? A. No, sir, there was not." To this question defendant objected, but the objection was overruled. Again: "Didn't they accuse you or any of them, then and there, with being at fault for his injury for sending him to work in that place *which was dangerous?*" Objected to; objection overruled. "A. No sir." Exception saved. "Q. On that day and in that mine, after the injury of Mr. Wojtylak and before he was taken from the mine, didn't Leopold Pokelli say to you when you asked, 'Is he badly hurt?' and the answer from him came, 'He won't need the props that you did not send,' and did he not further use the words, 'Damn you, you are the fault of his being hurt?'" Defendant again objected that it was incompetent. The objection was overruled, and exception saved. The witness answered: "No, sir; not to my knowledge, he did not."

Thereupon, in rebuttal, and to impeach Graham, the plaintiff over the objection of defendant, later called Gontarewitz and Gorski, and repeated the question asked Graham, and they testified that Pokelli did say what Graham denied he said to him.

It will be observed, first, that the declaration thus admitted against defendant was not a statement or declaration of one of its managers or employees, but of one of the miners, since deceased, and made at least three-quarters of an hour after plaintiff was hurt. Indeed no effort whatever was made to show that Graham, the pit boss, made any reply to this charge and denunciation of himself. This evidence was clearly incompetent. It was no part of the *res gestae*. Even if Graham had made declarations that evening as to the cause of plaintiff's injury, they would not have been competent evidence in chief against the defendant. They could only have been a narrative of what had oc-

curred in the morning. What he said at the time plaintiff asked for the props, if anything, was competent because said in the discharge of his duty to his employer, but what he said in the evening, ten hours after the conversation in the morning, was no part of the transaction. It was utterly incompetent as impeaching testimony, because wholly incompetent and irrelevant.

Contradictory statements which may be shown for the purpose of impeaching a witness must be of fact, pertinent to the issue and which could have been shown in evidence as facts independent of the inconsistency. [Hamburger v. Rinkel, 164 Mo. l. c. 407.]

This statement, however, was not even the inconsistent statement of Graham, because Gorski or Gontarwitz neither pretended to testify that Graham made any reply whatever to Pokelli's statement. The whole matter then resolves itself into the simple proposition whether, as against the defendant, the statement of Pokelli charging defendant's pit boss with neglect in not furnishing the props to plaintiff, and cursing him for being the cause of plaintiff's injury, was competent. We know no rule of evidence or any sound principle of law that would justify it. It is now claimed that it was competent on cross-examination to refresh Graham's memory or rather to test his reliability as a witness as to the occurrences in the morning. As we have already said, what occurred in the early morning when plaintiff and his witness assert plaintiff asked for props was all well enough, because said in the discharge of Graham's duty, as the representative and agent of defendant, but it is clear that it was incompetent for the purpose of impeachment. It is obvious that the controlling purpose of this inquiry of Graham and the attempt to impeach him thereon was to get before the jury Pokelli's conclusion as to who was in fault, a fact that the jury was impaneled to try and determine. That this evidence was exceedingly

Vol 188 mo—19

damaging and tended to inflame the minds of the jury against Graham and consequently against defendant, for sending the plaintiff into the dangerous place, there can be no doubt whatever. It should have been excluded. There was no way of testing Pokelli's knowledge of the danger, or his competency to judge of the danger, of plaintiff's room. It was not a part of the *res gestae,* nor an admission of the defendant. [Adams v. Railroad, 74 Mo. 1. c. 556; Ruschenberg v. Railroad, 161 Mo. 1. c. 80; Barker v. Railroad, 126 Mo. 143.]

It was incompetent as impeaching evidence, being on collateral and impertinent matter. [Roe v. Bank of Versailles, 167 Mo. 1. c. 426; Hamburger v. Rinkel, 164 Mo. 1. c. 407.]

IV. Error was also committed in permitting Mr. Atwood, counsel for plaintiff, to testify when he (Atwood) first became aware that defendant claimed to have plaintiff's release of the cause of the action sued on.

In the second paragraph of defendant's answer this release was pleaded as an affirmative defense, to which plaintiff replied that he could not read or understand the English language and the release was procured from him by fraud by misrepresenting it as a mere receipt for $100, paid him by defendant as a gratuity.

Under the issue thus framed, it was important for plaintiff to convince the jury that he did not know he had given a release of his action set forth in the instrument. His knowledge would be inconsistent with his claim of fraud. On the part of the defendant, Mr. Cadmus, who obtained the release, and Dr. Brock both testified it was fully explained to plaintiff when he executed it. On his part he and his daughter, who it seems was only eight years of age when the release was executed, and had never been to school and could neither speak nor understand the English language, testified

to the plaintiff's ignorance of the nature of the instrument. The answer containing the plea of this release was filed November 21, 1898. Thus the testimony stood pro and con on this defense when plaintiff called Mr. Atwood and his co-counsel then asked him this question: "Q. Mr. Atwood, I will hand you the amended answer of the defendant in this case, filed November 21, 1898, and I will call your attention to the second paragraph of said answer in which this alleged release is pleaded. I want to ask you, if prior to the filing of that answer, you knew of any of the company claiming to have a release from Wojtylak, or if that was the first notice *you* had of the fact?" To this question defendant's counsel objected that it was incompetent; that it was immaterial whether Mr. Atwood knew it or not. The objection was overruled and an exception duly saved. Mr. Atwood then answered: "Yes, I know positively, Mr. Reed; I did not get it directly from the answer, but through the medium of my associates; I was informed that the answer was filed and that was the first information I had that there was such a defense set up, but I did not get my first information from the pleading itself. Q. But you got that after the answer was filed? A. I presume so."

The issue was whether plaintiff had executed the release and knew that he was releasing his cause of action, not whether Mr. Atwood knew it. How could Mr. Atwood's ignorance of it affect plaintiff's knowledge? Mr. Atwood's testimony could have no other effect than that of proving plaintiff's self-serving declarations in his own behalf, and thus lay the foundation for an argument to the jury that plaintiff did not know he had executed the release, because, if he had, he would have told his attorney in the case.

Such a line of argument would doubtless have had great force with the jury in passing upon this question in the case.

V. In his petition plaintiff had not counted upon his loss of earnings and loss of time. When plaintiff first offered evidence of the value of his earnings and time the court on objection excluded it. Afterwards plaintiff was recalled and this same character of evidence offered. Again objection was made, but the objection was overruled "for the reason that the court had excluded it when offered in chief." It seems to be conceded that this evidence was not admissible under the pleadings and the decisions by this court in Mellor v. Railroad, 105 Mo. 455; Coontz v. Railroad, 115 Mo. l. c. 673; Pinney v. Berry, 61 Mo. l. c. 366; Slaughter v. Railroad, 116 Mo. 269.

But in justification of this testimony plaintiff insists it was admissible in rebuttal. It is clear it was not admitted as rebuttal but because the learned circuit judge was of the opinion he had erroneously excluded it in chief, but because Mr. Braidwood, a witness for defendant and a former pit boss and superintendent of this mine during the time plaintiff worked in it, testified that he knew plaintiff well and frequently came in contact with him, and knew his capacity as a miner, and that plaintiff was a competent miner and able to work his place in good shape and *a man that always made good wages,* plaintiff insists this evidence was proper to show that plaintiff really earned less than an average miner, and to rebut Braidwood's evidence from which the jury might draw the deduction that plaintiff could not have drawn good wages unless he had been a skillful man. It is quite apparent that this evidence was admitted as evidence in chief and that it had no tendency to rebut Braidwood's evidence. The latter was not asked what he considered good wages, or what wages an average man could earn in that mine during that time, or any other fact, that opened proof of the daily earnings of the plaintiff. It was error to admit it either as evidence in chief or in rebuttal.

VI.   We think there was no error in the second instruction for the plaintiff.   We think there was ample evidence to support the hypothesis put to the jury and that if those facts were established, as we think they were, then Graham was not a fellow-servant of the plaintiff and the other miners, but bore the relation of a vice-principal of the defendant company.

VII.   Error is assigned in the giving of the ninth instruction for plaintiff.

Our statute, section 654, Revised Statutes 1899, now permits the plaintiff to assail a release pleaded in the answer, by alleging in the *reply* and proving that such release or other discharge was fraudulently or wrongfully procured.   There was evidence of a tender of the amount of the consideration named in the release into court for the defendant, but defendant could not have taken it down at any time without permission from the court, had it elected to do so.   There was no evidence of any other tender back to defendant "within a reasonable time after plaintiff first learned that said instrument was a full release."   If the tender in court was relied on as sufficient, then the instruction should have been so framed as to have fixed that as the time and place of the tender, and not left it to be surmised whether plaintiff had made some other tender or when he discovered the instrument was a full release.

Looking at the order of the court in the light of Och v. Railroad, 130 Mo. 1. c. 45, it is very doubtful, to say the least, whether it complies with the spirit or the language of that decision, which is modified only to the extent of permitting the tender to be made, and the fraud pleaded in a reply instead of the petition.

VIII.   Instruction numbered one given by the court of its own motion is challenged for the reason that it does not place the burden of showing the failure of props on the plaintiff.   This was the negligence

charged and the instruction should be amended so as to conform to the law on that subject.

IX. We think the objection to instruction numbered three given by the court of its own motion is without merit. The release was not challenged on the insufficiency of the consideration *alone*.

X. Instruction numbered two of the series given by the court of its own motion is not objectionable as an abstract proposition of law, but that offered by defendant in its 18th instruction which was refused is preferable and more applicable to the facts developed in this case.

XI. Appellant urges that the circuit court erred in refusing two instructions prayed by it, numbered 3 and 21, to the effect that if the jury believe that the plaintiff's cause of action was barred by the laws of the State of Kansas before the commencement of this action plaintiff could not recover. The laws of Kansas as to limitation of actions like this were read in evidence and in connection therewith plaintiff refers us to section 4280, Revised Statutes 1899, adopted and approved May 24, 1899, three years after this suit was commenced. Defendant is a Missouri corporation. There was no proof of the statutes of Kansas as to the character of judgment which plaintiff might have recovered in Kansas for his injury. Whether he could have obtained a full judgment as on personal service, or whether his judgment would have been binding only on property attached in said State, we are not advised by the testimony, but counsel for plaintiff assert that the Kansas statute only permits a judgment *in rem* against the property attached.

As the burden was on the defendant to show that the action was fully barred by the laws of Kansas, we think no error was committed in refusing these two instructions, even if it be conceded that the act of 1899,

section 4280, Revised Statutes 1899, has any reference to actions then pending.

Moreover, we are bound by the Kansas law on this subject and the Supreme Court of that State has as recently as December 12, 1903, in Williams v. Railroad, 74 Pac. 600, held that a foreign corporation is "out of the State" within the meaning of section 21 of the Code of that State and for that reason cannot avail itself of the Statute of Limitations of that State. While the opinion in that case is not in harmony with our own decision in Sidway v. Mo. L. & L. Stock Co. 187 Mo. 649, it must govern this point, as section 4280, Revised Statutes 1899, only permits this bar when the action is barred by the laws of the State in which it originated.

XII. The circuit court refused all of defendant's instructions on the subject of contributory negligence. In so doing it committed manifest error. This action is not a statutory action based upon the violation of the Kansas or Missouri mining acts. The cases brought on statutes giving damages for *wilful* violations of such acts and in which it is ruled that contributory negligence of the miner is no defense, have no application here.

This is merely a common law action for negligence. The testimony of the miners, and the rules of the company in evidence, alike established that it was the duty of plaintiff to look after the safety of his room in the mine. The very purpose of furnishing him props, the lack of which he makes the basis of his action, was to enable him to properly shore up and prop the roof. The evidence which he himself gave shows there was no lack of props until the day he was hurt. He testifies that he saw nothing to make him believe it was dangerous that morning. We think it was a question for the jury to answer whether in view of the testimony as to his capacity as a miner and the length of time he had worked in this mine, and as to what pre-

cautions, he took that morning as to examining or
sounding the roof of his room before he went to work,
and as to his carelessly knocking out one of the props
that supported the roof, he was guilty of such contrib-
utory negligence as will bar his action. The evidence
on these points tended to show that he was heedless of
his own safety and that but for his own negligence he
would not have been injured.

We are cited to Bowerman v. Lackawanna Min.
Co., 98 Mo. App. 308. That was an action on the stat-
ute, and hence is not in point, but the Court of Appeals
constructed the clause, and "it shall be the duty of the
owner, agent or operator to send down all such props
when required," to mean "when *needed*," and it was
not the duty of the miners to "request" or "demand"
them, but it is that of the company to furnish them be-
cause they are needed and of this fact it is conclusively
presumed to be apprised. Of course no such rule is ap-
plicable to this common law action for negligence, but
we are unwilling to sanction the doctrine they an-
nounced in Bowerman's case. That decision is in di-
rect conflict with a former decision by the same court,
Adams v. K. & T. Coal Co., 85 Mo. App. l. c. 495, where-
in it is said, "We do not mean to state that when the
mine operator violates his statutory duty to furnish
props *on request* of the servant such servant may vol-
untarily and knowingly place himself in peril which is
open and patent to the observation of any reasonable
man, for that would amount to self-inflicted injury.
But the *statute was intended* (when violated) *to cut
off the excuse* of the operator that he had furnished
what he thought was and what appeared to be a safe
place to work, even though the *servant* also thought it
was safe, *if he*, nevertheless, out of reasonable caution
against accident, *had demanded the props*." Our stat-
ute is largely a rescript of the Illinois statute on this
subject. The Supreme Court of that State has summed
up, in a few words, its construction of the statute of

that State, in Western A. C. & C. Co. v. Beaver, 192 Ill. 333, 61 N. E. 335, as follows: "Appellant cannot excuse a willful failure on its part to furnish suitable props and cap-pieces to the deceased, *upon his request,* to make his room safe, *as required by the statute,* by showing [this being the peculiar Illinois doctrine as to contributory negligence] that Beaver was guilty of negligence which contributed to the injury. . . . . We are of the opinion the *miner* must be the one to determine the length and dimensions of the props and cap-pieces *which he deems necessary* to properly secure the roof for his own safety. If he orders six and one-half foot props, the owner or operator has not complied with the statute when he has furnished props which must be spliced or sawed in two before they can be used."

We think section 8822, Revised Statutes 1899, means that the mining company shall keep on hand a sufficient supply of props, so that when a miner requests them they shall send them to him, without unnecessary delay, to enable him to prop his room, but as already said, this is not a statutory action, and the facts in the evidence entitled defendant to proper instructions on contributory negligence. We have sufficiently indicated our views as to the principles of law which must control in the trial of this cause. We may, however, remark that after the plaintiff had testified that he had not needed props on any other day, the court should have withdrawn the evidence of other miners as to the lack of props in their rooms or generally. Plaintiff was not entitled to recover because the company had failed, if it had, to furnish other miners with props.

For the errors noted the judgment is reversed and the cause remanded for a new trial in accordance with the views herein expressed.

All concur.